**RALPH ROGERS & COMPANY,**
Petitioner/Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,**
Respondent/Cross–Petitioner.

Nos. 88–1330, 88–1524.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 8, 1988.

Decided March 1, 1989.

Terence G. Connor, Morgan Lewis & Bockius, Miami, Fla., petitioner/cross-respondent.

Laurence Zakson, N.L.R.B., Washington, D.C., Barbara A. Atkin, Aileen A. Armstrong, Washington, D.C., for respondent/cross-petitioner.

Before WOOD, Jr., COFFEY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Ralph Rogers Company (the "Company") refused to bargain with a unit of its operators employed in a four-county area—including Orange, Brevard, Seminole and Volusia Counties—surrounding Orlando, Florida (the "four-county area"), following a National Labor Relations Board (the "Board") election won by the union. The Board found that the Company's refusal to bargain constituted an unfair labor practice under Sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act (the "Act") and ordered the Company to bargain with the union. The Company now asks us to review the Board's bargaining order and the Board cross-appeals asking us to enforce its decision. We hold that the Board acted well within its discretion in finding that the Company committed an unfair labor practice in refusing to bargain with the union and, therefore, we enforce the Board's order.

I.

Ralph Rogers Company, an Indiana[1] company engaged in construction site preparation and earth-moving projects, expanded into Florida in 1982 and shortly thereafter entered into a § 8(f) pre-hire agreement covering the four-county area with Operating Engineers Local 673 (the "union"). The pre-hire agreement set forth the terms and conditions under which members of the union's hiring hall would work on sites controlled by the Company. The agreement with the union was effectuated for the first time in August, 1983, when the

---

1. This circuit is a proper venue for both the petition and the cross-petition since the Company "resides" in Indiana within the meaning of §§ 10(e) and (f) of the Act.

Company was awarded its first job in the four-county area.

Following its entrance into the Florida market, the Company established an office and shop in Orlando. Contract administration, accounting, and heavy equipment storage and repair were all performed at that location. A general manager was in overall control of the Company's Florida operations and was assisted by a general superintendent who, working out of the Orlando office, made all final employment-related decisions. The general superintendent regularly visited the individual job sites, attempting to visit at least one per day. Site superintendents reported to the general superintendent and were responsible for equipping their job sites with the required complement of material and employees, keeping records for their job sites, and maintaining the payroll. The payroll itself was sent to Nashville, where the checks were prepared. The Company also employed a director of labor relations who, working out of the Orlando office, was responsible for labor relations matters at all Florida job sites.

During the 27 months in which the pre-hire agreement was in force, the Company hired a total of 128 workers. Only 7 of those workers were employed by the Company for as many as 14 of those 27 months, and they accounted for just 23% of the total number of hours worked. The Company's practice is to hire and fire employees on a project-by-project basis. Nevertheless, the Company often uses its operators on more than one job and also transfers operators from site to site during lulls in their work or after the completion of a job. Similarly, the Company often transfers supervisors from site to site and occasionally gives them responsibility for more than one site at a time.

The pre-hire agreement between the Company and the union expired in September, 1985. The parties entered into negotiations for a new agreement, but reached an impasse over the Company's demand for wage concessions. Following the impasse, the Company broke off negotiations, unilaterally instituted its proposed wage rates on future projects, and withdrew its recognition of the union. The union responded by refusing to refer workers from its hiring hall for Company projects.

The union also took legal action against the Company. First, the union, in April 1986, filed an unfair labor practice charge against the Company alleging that the imposition of new wage rates and the withdrawal of recognition constituted an unlawful refusal to bargain (the "original charge").[2] The union contended that, because it had achieved majority support during the course of the pre-hire agreement, its relationship with the Company changed from one based solely on the pre-hire agreement under § 8(f)[3] to one in which the union was the exclusive bargaining representative of the Company's employees under § 9(a) of the Act.[4] Since, under § 9(a), a union is entitled to recognition by an employer as the exclusive bargaining representative of the employees, the union claimed that the Company's unilateral im-

---

**2.** This unfair labor practice charge is not the same charge as that presently at issue. To differentiate between the two charges, we will refer to the April 1986 charge as the "original charge." In contrast, we will refer to the charge currently before us as the "present charge."

**3.** Section 8(f) of the Act, 29 U.S.C. § 158(f), states that:

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and con-

struction employees are members ... because (1) the majority status of such labor organizations has not been established under the provisions of section 159 [§ 9] of this title prior to the making of such agreement....

**4.** Section 9(a) of the Act, 29 U.S.C. § 159(a), states that:

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment....

position of new terms and its withdrawal of recognition constituted an unfair labor practice.

Second, the union filed a representation petition with the Board's regional office seeking to represent a unit of "[a]ll full-time and regular part-time employees employed by the [Company] as operators, oilers, mechanics and drivers at the maintenance shop and all job sites in [the four-county area]."[5] This petition was filed as an alternative to the original charge since the original charge assumed that the union was already the legitimate representative of the Company's employees.

The Board's Regional Director found insufficient evidence to support the union's contention that it represented a majority of the Company's relevant employees during the course of the pre-hire agreement and, on August 29, 1986, dismissed the original charge. According to the Regional Director, the Company did not employ a "permanent and stable work force." Without such a work force, the union had to show that it had majority support at individual work sites in order to qualify as the collective bargaining representative of the Company's employees. Since the union did not contend that it had majority support at individual sites, the Regional Director found that the union's § 8(f) status had not blossomed into § 9(a) status and, thus, the Company's actions did not constitute an unfair labor practice.

Eight months later, on March 19, 1987, the Regional Director decided in favor of the union in the representation proceeding and ordered an election. The Regional Director found that a unit of the Company's operators in the four-county area was an appropriate unit and rejected the Company's contention that only single job site units would be appropriate. The Regional Director based these conclusions on the Company's

> centralized hiring and firing of operators, the significant employee interchange

among the jobsites in the four county area, the Employer's centralized administration, the centralized control over labor relations, the lack of substantial autonomy of the field superintendents, and the history of collective bargaining in a multi-location unit in the four county area.

The Regional Director also noted that even if the prehire agreement could not be considered a collective bargaining agreement, so that there would be no collective bargaining history, he would have still reached the same conclusion.

The Board declined to review the Regional Director's Decision and Direction of Election and an election was held in which the Company's operators voted in favor of the union. The Company responded by refusing to bargain with the union and the present charge resulted. The Company admits that it refused to bargain but claims that the refusal was justified because the Regional Director's Decision and Direction of Election was unreasonable, arbitrary, and not supported by substantial evidence. According to the Company, the Decision and Direction of Election was flawed because the Regional Director's unit determination in the representation proceeding was fundamentally inconsistent with his unit determination in the union's original unfair labor practice charge. The Company also claims that, even if there is no inconsistency, the Regional Director's unit determination in the representation proceeding was unreasonable because it was based on inappropriate criteria such as prior bargaining history and the extent of union organizing.

## II.

We will uphold a unit determination so long as the unit selected by the Board is an appropriate unit. *NLRB v. Chicago Health & Tennis Clubs, Inc.*, 567 F.2d 331, 334 (7th Cir.), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). If two different units are supported by substan-

---

**5.** The Board ultimately certified the union to represent two separate units. The first, a unit composed of all of the Company's jobsite operators, is being challenged here. The second, a unit consisting of all of the Company's mechanics and apprentices in the Orlando area, has not been challenged by the Company.

tial evidence, we will accept the Board's choice, even if we do not agree that the Board chose the most appropriate unit, and we will not substitute our own preference. *Id.* We note that while this standard of review is fundamentally deferential, it is not a rubber stamp of the Board's decision. *See NLRB v. Indianapolis Mack Sales and Service, Inc.,* 802 F.2d 280, 283 (7th Cir.1986). We conduct a thorough review of the record to ensure that the unit determination is not unreasonable, arbitrary or capricious, or unsupported by substantial evidence. *Chicago Health & Tennis,* 567 F.2d at 335.

In this case, the Company claims that the Regional Director's unit determination was arbitrary because it was inconsistent with his previous decision in the original unfair labor practice proceeding. The Company believes that the Regional Director determined in the original unfair labor practice proceeding that only site-by-site units would be appropriate for this employer. That determination is inconsistent, the Company claims, with the Regional Director's determination in the representation proceeding that a unit of all operators in the four-county area is appropriate. To evaluate this argument, it is imperative to understand the nature of the union's original charge.

Shortly after entering the Florida market, the Company entered into a § 8(f) pre-hire agreement with the union specifying the terms and conditions under which members of the union's hiring hall would work for the Company. Section 8(f) agreements are exceptions to the general rule that it is an unfair labor practice for an employer to enter into a collective bargaining agreement with a union that does not have majority support among the employer's work force. *NLRB v. Local Union No. 103,*

*International Association of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 348–49, 98 S.Ct. 651, 659–60, 54 L.Ed.2d 586 (1978) ("Higdon"). The exception recognizes the fluid nature of employment in the construction industry as well as the need of employers to be able to calculate labor costs with certainty so as to appropriately bid for projects. *Id.*

■ Still, a § 8(f) agreement does not provide the union with the same panoply of rights it would have if it were the elected representative of the employees. For example, an employer is free to unilaterally repudiate a § 8(f) agreement and change the terms under which it will hire union members. *See id.* at 345, 98 S.Ct. at 657.[6] However, a pre-hire agreement can blossom into § 9(a) status for a union, which does bring with it the full range of the Act's protections, if the union can establish majority support among the company's employees. *Id.*

There are two methods by which a union can establish majority support. First, if the employer has hired a *permanent and stable* complement of workers in the relevant unit, then the union can show majority support by proving that, at some time during the term of the prehire agreement, a majority of those permanent workers belonged to the union. *Construction Erectors, Inc. v. NLRB,* 661 F.2d 801, 803 (9th Cir.1981); *Giordano Construction Co.,* 256 N.L.R.B. 47 (1981); *Precision Striping, Inc.,* 245 N.L.R.B. 169 (1979). Showing majority support through this method accords the union § 9(a) status at every work site, present and future, for the term of the pre-hire agreement.[7] The theory behind this method is that if an employer hires on a permanent and stable basis, then the nature of the work force is such that a

---

**6.** The Board has recently changed its rules with regard to the method by which a § 8(f) relationship can become a § 9(a) relationship. *See John Deklewa & Sons, Inc.,* 282 N.L.R.B. No. 184 (1987). We need not discuss those changes, however, as the Company claims only that the Regional Director's decisions were inconsistent given the law prevailing at the time the decisions were made.

**7.** We need not, and do not, decide whether a company can defeat the union's § 9(a) status by showing that the union does not actually have majority support among the permanent and stable workers. *See Precision Striping, Inc. v. NLRB,* 642 F.2d 1144, 1147 (9th Cir.1981) (a showing that a majority of the permanent and stable workers belong to the union creates only a "rebuttable presumption" of majority support).

"showing of majority support made at a particular point in time reasonably can be said to have significance at a subsequent time." *Construction Erectors Inc.*, 265 N.L.R.B. 786, 787 (1982).

The second method by which a union can show majority support applies when an employer does not have a permanent and stable complement of workers, but instead hires on a project-by-project basis. In that situation, a § 9(a) relationship would arise only if the union could show majority support among the employees at each particular site. *Construction Erectors*, 661 F.2d at 804; *Dee Cee Floor Covering, Inc.*, 232 N.L.R.B. 421, 422 (1977). Under this method, however, a showing of majority support at a particular site would only give the union § 9(a) status for that site; the status would not carry over to other sites controlled by the company. The courts reason that in the case of project-by-project hiring, unlike permanent and stable hiring, a majority showing at one site would not necessarily signify the desire for representation of workers at other sites.

In its original charge, the union claimed that a § 9(a) relationship had blossomed from the § 8(f) pre-hire agreement because it had achieved a majority of support among a permanent and stable group of employees.[8] The Regional Director, however, rejected the union's argument:

> [T]he evidence discloses that [the Company] employed approximately 128 unit employees during the 27 months that the agreement was in effect. These 128 employees performed approximately 71,550 hours of work. Only seven employees worked 14 out of the 27 months that the agreement was in effect, which comes to only five percent of [the Company's] total work force.... In sum, it is conclud-

ed that [the Company] did not employ a permanent and stable work force in the bargaining unit as set forth in the 1982–85 agreement....

Because the union was unable to show that the Company employed a permanent and stable work force, and thus failed to prove majority support, the Regional Director concluded that the Company acted lawfully when it withdrew recognition from the union.

■ The Company claims that the Regional Director's finding that the Company did not employ a permanent and stable complement of employees necessarily means that those same employees could not be an appropriate unit for purposes of a representation petition. According to the Company, the same standard controls the decision of whether a group of employees are permanent and stable for purposes of a § 8(f) case and the decision of whether a group of employees constitute an appropriate unit for purposes of a representation proceeding. The Company thus believes that the Regional Director's decisions in the unfair labor practice proceeding and the representation proceeding are fundamentally inconsistent.

■ The problem with the Company's argument is that the same standard does *not* apply for both § 8(f) and § 9(a) proceedings. The unit determination test under § 9(a), even in the construction industry context, is whether the proposed unit shares a community of interests, not whether the employer has a stable and permanent set of workers.[9] *See Peter Kiewit Sons' Co. and South Prairie Construction Co.*, 231 N.L.R.B. 76, 77 (1977), *aff'd*, 595 F.2d 844 (D.C.Cir.1979). Some of the factors used by this circuit in determin-

---

**8.** The union made no allegation that it commanded a majority of support at individual job sites.

**9.** This is not to say that the "community of interests" test is irrelevant to the § 8(f) situation. In that context the Regional Director, even before she determines whether the company hires on a permanent and stable basis or a project-by-project basis, must determine the appropriate unit within which to look at the employer's hiring pattern. The determination of

that unit is governed, just as is the unit determination in the § 9(a) context, by the "community of interests" test. *See Hageman Underground Construction*, 253 N.L.R.B. 60 n. 4 (1980) (Before determining whether the company's backhoe operators were hired on a permanent and stable basis, the Board noted that the ALJ correctly determined, using the community of interests test, that the backhoe operators were an appropriate unit.).

ing whether a group of employees share a community of interests include: (1) the geographic proximity of the work sites; (2) a history of collective bargaining; (3) the degree of functional integration of the employer's operations; (4) the centralization of management and labor relations functions; (5) similarity in skills, employee benefits, wages and hours of work; and (6) the degree of employee interchange among the company's sites. *See Friendly Ice Cream Corp. v. NLRB,* 705 F.2d 570, 576 (7th Cir.1983); *Chicago Health & Tennis,* 567 F.2d at 335.

The Company cites, among other cases, *Daniel Construction Co.,* 133 N.L.R.B. 264 (1961) and *The Longcrier Co.,* 277 N.L.R.B. 570 (1987), for the proposition that the test actually used by the Board in construction industry unit determination cases is whether a company employs a "common nucleus" of employees from project-to-project. The Company is correct that the Board takes into account whether a common nucleus of employees has been shown. But again, a common nucleus is only one among a number of factors the Board takes into account in construction industry cases. In *Daniel,* for example, the Board based its decision that a multi-site unit was appropriate on "the centralized control of labor relations, similarity of skills, functions and working conditions at all projects, along with the employee transfer between projects...." 133 N.L.R.B. at 265 (citations omitted); *See also Longcrier Co.,* 277 N.L.R.B. at 571 (Board found county-wide unit inappropriate where there was no common nucleus *and* where terms and conditions were different at each job site and the site superintendent was responsible for all employment-related decisions); *Electric Machinery, Inc.,* 269 N.L.R.B. 499, 500–01 (1984) (uses multi-factor community of interests test to determine the appropriate unit). Thus, no inconsistency exists in a finding that, while a group of employees do not represent a permanent and stable workforce, they nevertheless constitute an appropriate election unit.

■ In this case, there is substantial evidence in the record to support the Regional Director's finding that the company's operators in the four-county area constituted an appropriate unit. First, evidence was introduced that the Company's operators have similar skills and working conditions. Second, the evidence showed that labor relations decisionmaking was centralized in the Orlando office. third, the four-county area represents the extent of the union's organizing efforts. Finally, there was evidence of both employee and supervisor interchange within the four-county area. Thus, substantial evidence in the record supports the Regional Director's unit determination.

The Company claims that the Regional Director's determination was not based on all of the factors just discussed but actually rests on two factors—the bargaining history between the union and the Company and the extent of union organizing—neither of which can legitimately support the unit determination in this case. Any reliance on bargaining history is improper, according to the Company, because there was no bargaining history. The only agreement between the union and the Company was the prehire agreement, and that agreement was no more than a voluntary undertaking with no relationship to the employees' community of interests. As for the extent of union organizing, the Company claims that this factor was given *controlling* weight by the Regional Director in the face of the well-known rule that "the extent to which the employees have organized shall not be controlling." 29 U.S.C. § 159(c)(5).

We need not decide whether a pre-hire agreement can serve as evidence of bargaining history for even without such evidence there was ample support for finding a community of interests among the Company's operators. Also, it is plain that the Regional Director did not give controlling weight to the extent of the union's organizing. Indeed, the Regional Director did not even mention the extent of organizing as a factor in his unit determination. Instead, the Regional Director based his determination on such factors as "the Employer's centralized hiring and firing of operators, the significant employee interchange among job sites in the four county area,

the Employer's centralized administration, the centralized control over labor relations, [and] the lack of substantial autonomy of the field superintendents." [10] As we discussed above, we find that, given these factors, the Regional Director acted well within his discretion in determining that a unit consisting of the Company's operators in the four-county area is an appropriate unit.

### III.

Because we find no inconsistency in the Regional Director's disposition of this case and because sufficient evidence supports his unit determination, we grant the Board's cross-petition and order the Company to bargain with the union.

**10.** The Regional Director also cited "the history of collective bargaining in a multi-location unit in the four county area" as a factor in his unit determination. The Regional Director anticipa-

ted the argument the Company makes here, however, and proceeded to find that, even if there had been no history of collective bargaining, his decision would not be changed.