**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**JOE B. FOODS, INCORPORATED doing business as Butera Finer Foods, Respondent.**

No. 90–1146.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1991.

Decided Jan. 6, 1992.

Elizabeth Kinney, Chicago, Ill., Aileen A. Armstrong, William M. Bernstein (argued), Appellate Court, Enforcement Litigation, Washington, D.C., for petitioner.

John J. Mallon, Brian M. Smith (argued), Smith & Associates, Troy, Mich., for respondent.

Before COFFEY, RIPPLE, and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

The National Labor Relations Board (the Board) seeks enforcement of its order against Joe B. Foods, Inc. d/b/a Butera Finer Foods. For the following reasons, we enforce the order.

## I

### BACKGROUND

On December 24, 1986, Joe B. Foods, Inc. (Joe B. Foods), a corporation formed by Joseph Butera, purchased from Certified Grocers of Illinois Wholesale, Inc. (Certified) three Chicago supermarkets at 4608 West Belmont Avenue, 3518 West Division Street, and 3939 West Ogden Avenue.

During its ownership, Certified had recognized United Food and Commercial Workers Local 546 (the Union) as the bargaining representative of the employees of the three stores' meat and fish departments. Each of the three meat and fish departments was a separate bargaining unit, and Certified signed separate, though identical, collective bargaining agreements for each unit. Bargaining for all three units was conducted in a single session. The Ogden Avenue store's collective bargaining agreement defined the bargaining unit as "all employees in the meat department of said Employer who process, pack, wrap, handle, price and sell frozen and fresh meats on Employer's premises."

After Joe B. Foods bought the three supermarkets, Yvonne Harris, Certified's store manager at the Ogden Avenue store, distributed employment applications to store employees, including employees of the fish and meat department, for employment with Joe B. Foods. At this time seven employees were working regularly in the meat department: Tom Ademak, the meat manager; Arthur Bradley, Fred Feller, and John Russell, journeymen meatcutters; Marilyn Bell, wrapper; Gus Rodriquez, fish man; Emanuel Rodriquez, fish man and wrapper.

After the change of ownership, the Ogden Avenue store was closed for remodeling from late January to February 26, 1987. During this time, Mr. Butera interviewed the employees from Certified's Ogden Avenue meat department. All were offered jobs. With the exception of Tom Ademak, who declined Mr. Butera's job offer, all of Certified's Ogden Avenue meat department employees came to work for Joe B. Foods, occupied the same job classifications, and performed the same work as they had for Certified.

In addition to the former Certified employees, the new Joe B. Foods meat department employed Steve Butera as meat department manager, Paul Palazzolo as back room boss and meat manager trainee, and Frank Palazzolo as a meatcutter and back room boss trainee. On March 6, Joe B. Foods hired Stanley Sokolowski as a back room meat manager and meat manager trainee. Several utility clerks were also hired: Chris Hill, James Presley, Michael Williams, Harold Wells, and Chris Minter. The primary duties of the utility clerks were bagging chickens and cleaning up. They also assisted the meat wrapper by "catching" meat after it had been wrapped, placing trays of meat in the cooler, and putting price labels on wrapped meat.

Operation of the meat department was essentially unaltered. During remodeling, Joe B. Foods installed rails so that the meat department could handle hanging quarters of meat; however, the store continued to receive 70 to 80 percent of its meat and fish in boxes, and the employees processed it in the same manner they had when the store was under Certified's ownership. The employees used the same tools and equipment, much of which Joe B. Foods had purchased from Certified. Joe B. Foods obtained its meat mostly from the suppliers that had previously supplied Certified. The meat department remained located in the rear of the store where it had been during Certified's ownership.

On April 16, the Union wrote to Joe B. Foods and asked to bargain. On April 21, Joseph Butera announced plans to install a 401(k) pension plan. On April 24, Joe B.

Foods refused to bargain with the Union, and Joseph Butera chided the meat department workers for seeking union representation.

The other two stores purchased by Joe B. Foods from Certified were reopened on May 13 and June 19.

## II

## THE BOARD PROCEEDINGS

This case came first before an Administrative Law Judge (the ALJ) on the Union's complaint that Joe B. Foods refused to bargain, unilaterally instituted a new pension plan, and threatened employees concerning union membership. The ALJ found that the meat department of the Ogden Avenue store remained an appropriate bargaining unit, that Joe B. Foods was obligated to bargain as the successor of Certified, and that its refusal to bargain was a violation of section 8(a)(1) and section 8(a)(5) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1) & (5). The ALJ also determined that, because pension plans are mandatory subjects of bargaining, Joe B. Foods' unilateral establishment of a new pension plan was an unfair labor practice. Moreover, he determined that, although the anti-union language used by Joseph Butera might have been permissible during an election campaign, his statement was a violation of section 8(a)(5) because it occurred at a time when the employer was refusing to bargain in violation of section 8(a)(5). He further determined that the language was also a violation of the section 7 rights of the employees. The ALJ recommended an order requiring Joe B. Foods to cease and desist from refusing to recognize and bargain with Local 546, from making unilateral changes in terms and working conditions of bargaining unit employees, and from coercively interrogating or threatening employees concerning union activities and membership. The order also required Joe B. Foods to post a notice at its stores, announcing that it would not refuse to recognize and bargain with Local 546, that it would not change unilaterally the wages, hours, and working conditions of bargaining unit employees, and that it

would not threaten employees or otherwise interfere with their exercise of rights guaranteed by section 7 of the National Labor Relations Act.

The Board affirmed the ALJ's rulings, findings and conclusions and adopted the ALJ's recommended order. It then applied to this court for enforcement of that order. In reply, Joe B. Foods challenges the Board's finding of successorship and asks that we deny enforcement.

## III

## ANALYSIS

A.  *Applicable Standards*

■ We have jurisdiction to consider the Board's petition for enforcement under 29 U.S.C. § 160(e). Section 160(e) also provides our standard of review: findings of fact by the Board are "conclusive" if they are supported by "substantial evidence on the record considered as a whole." *See U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1313–14 (7th Cir.1991); *see also NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). This standard of review "does not allow us to dabble in factfinding, and we may not displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case de novo." *NLRB v. P*I*E Nationwide, Inc.*, 923 F.2d 506, 513 (7th Cir.1991). The "Board's application of the law to particular facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had it considered the matter *de novo*." *U.S. Marine*, 944 F.2d at 1314 (quoting *Indianapolis Power & Light Co. v. NLRB*, 898 F.2d 524, 529 (7th Cir. 1990). *Cf. NLRB v. Don's Olney Foods, Inc.*, 870 F.2d 1279, 1281 (7th Cir.1989) (deferential standard of review applied to NLRB determination, both as to facts, and as to statutory interpretation, because "it

is a statute the Board is entrusted with enforcing.").

## B. *The Successorship Issue*

▮▮▮▮ Under the doctrine of successorship, if an employer carries on a newly-acquired business in substantially the same manner as its predecessor and hires a majority of its employees from the predecessor, it is obligated to bargain with the union that represented those employees under its predecessor. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 39–41, 107 S.Ct. 2225, 2233–35, 96 L.Ed.2d 22 (1987); *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 279, 92 S.Ct. 1571, 1577, 32 L.Ed.2d 61 (1972). A primarily factual approach, based on the totality of the circumstances of a given situation, is used to determine whether a new company is indeed a successor to the old. *Fall River Dyeing*, 482 U.S. at 43, 107 S.Ct. at 2236. "[T]he focus is on whether there is a 'substantial continuity' between the enterprises ... whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.* The " 'triggering' fact for the bargaining obligation" is the "composition of the successor's work force." *Id.* at 46, 107 S.Ct. at 2237. The composition of the successor's work force is measured when a "substantial and representative complement" of employees in the bargaining unit has been hired. *Id.* at 47, 107 S.Ct. at 2238.

Joe B. Foods' challenge to the Board's finding of successorship raises two separate groups of issues. First, Joe B. Foods contends that the Board erred in determining that the Ogden Avenue meat department was an appropriate bargaining unit. It argues that the only appropriate unit is a multistore unit composed of the meat de-

partments of all three stores purchased from Certified.[1] Consequently, successorship should not have been determined until a full complement of employees was hired for the meat departments of all three stores. Secondly, Joe B. Foods contends that, even if the Ogden Avenue meat department is an appropriate bargaining unit, the Board erred in excluding certain employees from the unit. If those employees had been included, the majority of employees in the Ogden Avenue store would not have been former employees of Certified and Joe B. Foods would not be a successor employer. Joe B. Foods has not challenged the Board's finding that there was continuity of working conditions and business enterprise. Thus in reviewing the Board's determination that Joe B. Foods succeeded to Certified's obligation to bargain with Local 546, we do not address the customary successorship issues of business continuity, but rather the issues involved in the Board's determination of an appropriate bargaining unit and in its determination as to who should be counted as members of the unit.

### 1. The bargaining unit

▮▮▮ Section 9(b) of the National Labor Relations Act, 29 U.S.C. § 159(b) directs the Board to "decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." To determine an appropriate bargaining unit, the "Board looks to the bargaining history and the 'community of interest,' or lack thereof." *NLRB v. Illinois–American Water Co.*, 933 F.2d 1368, 1375 (7th Cir.1991).

"[T]he selection of an appropriate bargaining unit lies largely within the discretion of the Board, whose decision, 'if not final, is rarely to be disturbed.' " *South Prairie Constr. v. Operating Eng'rs*, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48

---

**1.** Joe B. Foods also argues in passing for a "wall-to-wall" bargaining unit at the Ogden Ave-  nue store.

L.Ed.2d 382 (1976) (quoting *Packard Motor Co. v. NLRB*, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). "We will uphold a unit determination so long as the unit selected by the Board is an appropriate unit." *Ralph Rogers & Co. v. NLRB*, 870 F.2d 379, 382 (7th Cir.1989). "If two different units are supported by substantial evidence, we will accept the Board's choice, even if we do not agree that the Board chose the most appropriate unit, and we will not substitute our own preference." *Id.* "Although this standard of review is fundamentally deferential, it is not a rubber stamp of the Board's decision. We conduct a thorough review of the record to ensure that the unit determination is not unreasonable, arbitrary or capricious, or unsupported by substantial evidence." *Id.; see also NLRB v. Illinois–American Water Co.*, 933 F.2d at 1377.

The record supports the Board's determination that the meat department of the Ogden Avenue store was an appropriate bargaining unit. As Joe B. Foods concedes, single store units have been found presumptively appropriate, *Big Y Foods, Inc. v. NLRB*, 651 F.2d 40, 45 (1st Cir. 1981), and this presumption has been extended to single store meat departments. *NLRB v. Foodland, Inc.*, 744 F.2d 735, 738 (10th Cir.1984) (Board has long recognized that there are many differences between meat department employees and other employees in a retail grocery store with respect to wages, training, skills and supervision). The Board has held that the presumption in favor of meat department units does not apply where it "is demonstrated that meat department jobs do not entail the use of [traditional meatcutting] skills." *Hall's Super Duper*, 281 N.L.R.B. 1116 (1986). Here, however, the Board found that the "employees' job functions require specialized skills. Although 70 to 80 percent of the meat sold at the Respondent's facility is boxed, the addition of 'rails' to the meat department requires the employees to process full fore and hind quarters of meat." 296 N.L.R.B. No. 123 (1989).

The presumption which operates in favor of meat department bargaining units arises from a recognition that the employees of meat departments will normally possess a community of interest that justifies their inclusion in a bargaining unit separate from the other store employees. In the case of the Ogden Avenue meat department, the ALJ and the Board explicitly found that such a community of interest did in fact exist. The Board considered not only the specialized skills of the meat and fish department employees, but also that the department is separately supervised, and that the employees work exclusively in their department so that there is little or no interchange between the meat and fish employees and other store employees.

Finally, the Board emphasized that the single store meat department unit was the historic, existing unit. This emphasis is in accord with the Board's longstanding policy. "In determining what constitutes an appropriate bargaining unit, 'the Board has long given substantial weight to prior bargaining history. The Board is reluctant to disturb units established by collective bargaining so long as those units are not repugnant to Board policy or so constituted as to hamper employees in fully exercising rights guaranteed by the Act.'" *NLRB v. Marin Operating, Inc.*, 822 F.2d 890, 893 (9th Cir.1987) (quoting *Buffalo Broadcasting Co.*, 242 N.L.R.B. 1105, 1106 n. 2 (1979)); *see also NLRB v. Indianapolis Mack Sales & Serv., Inc.*, 802 F.2d 280, 286 (7th Cir.1986) (Cudahy, J., dissenting) (distinguishing between challenge to bargaining unit upon initial certification and bargaining unit with successful bargaining history).

Joe B. Foods contends that the Board and the ALJ erred in characterizing the Ogden Avenue meat department as the historical unit. It argues that (1) the unit was never certified by the Board, and (2) that Certified's bargaining history indicates that the Union and Certified conducted a single negotiation for all three meat departments and that identical collective bargaining agreements were signed for all three. Joe B. Foods' first assertion is doomed by well-settled case law to the contrary: A predecessor's voluntary or contractual rec-

ognition of a bargaining unit may be as binding on a successor as that arising from certification. *See NLRB v. Winco Petroleum Co.*, 668 F.2d 973, 981–82 (8th Cir. 1982); *NLRB v. Hudson River Aggregates, Inc.*, 639 F.2d 865, 871 (2d Cir.1981); *Mangold Mkts.*, 280 N.L.R.B. 773, 775 n. 8 (1986). Moreover, although a single negotiation was conducted for all three meat departments, the fact that Certified signed separate collective bargaining agreements for each meat department clearly indicates that each was in fact a separate unit.[2]

The Board also determined that the ALJ's exclusion of evidence of multistore bargaining units was not prejudicial under the circumstances here. This determination was well within the Board's discretion. The Board noted that, when the Union demanded recognition, only the Ogden Avenue store was in existence and, consequently, evidence of multistore bargaining units was not relevant.

### 2. The members of the bargaining unit

After determining that the Ogden Avenue meat department was an appropriate bargaining unit, the ALJ excluded several employees from it, some on the grounds that they were supervisors and thus ineligible, others on the grounds that they did not possess similar skills, receive similar pay, or have a community of interest with the members of the bargaining unit. Excluded as supervisors were Steve Butera, Paul Palazzolo, Frank Palazzolo, and Stanley Sokolowski.[3] Excluded for lack of a community of interest were the five utility clerks, Chris Hill, James Presley, Michael Williams, Harold Wells, and Chris Minter. All of the excluded employees were new employees hired by Joe B. Foods; none had been employed by Certified.[4]

We examine first the exclusion of the supervisors. The term "supervisor" is defined by Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11):

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

As we noted in *NLRB v. Ajax Tool Works, Inc.*, 713 F.2d 1307, 1311 (7th Cir.1983), it is "well-established that section 2(11) is to be read in the disjunctive; possession of any one of the above indicia of supervisory status is sufficient to render an employee a statutory supervisor." *See also NLRB v. Don's Olney Foods, Inc.*, 870 F.2d 1279, 1281 (7th Cir.1989); *American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 896 (7th Cir.1981); *NLRB v. Brown Specialty Co.*, 436 F.2d 372, 375 (7th Cir.1971). The ALJ based his decision as to each of the employees excluded as supervisors on a highly factual analysis of his duties and activities while at work in the meat department. We evaluate each in turn under the substantial evidence standard.

#### a. Steve Butera

About two weeks before the opening of the Ogden Avenue store, Joseph Butera hired his cousin Steve Butera to be the meat department manager. He intended that Steve Butera manage the meat departments of all three stores when all were open. During February and March, Steve Butera ran the meat department at Ogden Avenue. In April he began spend-

---

2. *See* A. Cox, D. Bok, R. Gorman & M. Finkin, *Cases and Materials on Labor Law* 279 (11th ed. 1991) (separate units often group together to conduct negotiations); Leslie, *Labor Bargaining Units,* 70 Va.L.Rev. 353, 381 (1984) (NLRA does not require union and employer to confine collective bargaining to a single unit).

3. The ALJ also found that a lack of community of interest, arising from their alignment with

management, was an alternate ground for excluding these four.

4. Since there were six former Certified employees, the exclusion of only four of the nine disputed supervisors and utility clerks would result in a bargaining unit in which a majority of employees had worked for Certified.

ing much of his time at the Division Street store, which was preparing to open. When the Belmont Avenue store opened, Steve Butera became supervisor of all three meat departments. The parties agree that as of the first week of May, Steve Butera met the statutory definition of supervisor. The question is whether Butera was a supervisor on April 24, when the Union requested bargaining.

During the time he spent at the Ogden Avenue store, Steve Butera ordered meat from suppliers and checked the quantity and freshness of meat in the meat counter. He took special orders from customers which he passed on to the meatcutters. He decided what cuts and quantities of meats were needed and instructed the meatcutters to prepare them. He issued orders to the fish employees to clean the fish case. He instructed employees when to take breaks, orally reprimanded them for poor job performance and issued written reprimands for neglect of duty. He recommended a raise for Emanuel Rodriquez, and Joseph Butera followed his recommendation without investigation. Steve Butera did not punch a timeclock, but instead wrote his own time on the timecard and approved it. When other employees failed to punch the clock, Steve Butera made the necessary alterations to their timecards.

After a careful examination of the record, we conclude that the evidence relied on by the ALJ was substantial and supported the ALJ's determination that Steve Butera was a supervisor.

b. Paul Palazzolo

The ALJ found the following determinative facts in regard to Paul Palazzolo's supervisory status. Palazzolo was hired before the opening of the Ogden Avenue store to be a back room boss and meat manager trainee. Joseph Butera testified that he hired Paul Palazzolo with the intention of making him meat manager at the Division Street store when it opened in May, and in fact Palazzolo did become the meat manager there. At the time of the Union's bargaining demand in April, Palazzolo was working at the Ogden Avenue

store. Palazzolo did some meatcutting, ground meat, made sausage, checked on deliveries and wrapped meat. But mainly he worked on the meat counter, performing many of the same duties as Steve Butera. Although Palazzolo had no authority to hire, fire, transfer employees, or set store policy, he spent most of his time giving directions to the meatcutters as to what meats to cut and corrected their work when they cut meat improperly. He told employees when to take breaks, directed fish employees on how to price fish, and reprimanded employees for lateness and inappropriate dress. In April, when the Union made its bargaining demand, Palazzolo was frequently left in charge of the Ogden Avenue meat department while Steve Butera prepared for the opening of the Division Street store. Like Steve Butera, Paul Palazzolo did not punch the time clock, but wrote his own hours on the card and signed it himself. He was paid $14.30 an hour (the former Certified meatcutters were paid $13.20) and received a $20 per week manager's premium.

Again, as in the case of Steve Butera, the facts set forth by the ALJ are supported by substantial evidence in the record, and these facts support the ALJ's determination that Palazzolo was a supervisor. The facts support the conclusion that Palazzolo used independent judgment in responsibly directing the other employees. *Cf. American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 895–96 (7th Cir.1981) (viewed as a whole, evidence of giving oral reprimands, assigning specific tasks, enforcing dress code and behavior rules, allocating work breaks, 35 cent per hour salary differential, etc., added up to supervisory status).

c. Frank Palazzolo

Frank Palazzolo was hired in February as a meatcutter and trainee for the position of back room boss. Frank Palazzolo did actual hands-on work in the meat department, grinding meat, making sausage, cutting meat, wrapping, working the counter, relieving the fish man, accepting deliveries, and loading the cooler. He testified that he had no authority to hire, fire,

discipline, transfer, set store policy, assign unscheduled overtime, or designate employee breaks. However, the evidence shows that, a month after the store opened, Steve Butera told meatcutter Arthur Bradley that he would have to follow Frank Palazzolo's orders or be fired. Arthur Bradley was later fired for not obeying Frank Palazzolo's orders. In April, after Palazzolo became back room boss, employees were expected to follow his instructions and to accept assignments from him. He told employees what cuts of meat were needed and how much meat to cut each day. He also gave employees instructions, which they were supposed to follow, concerning when to take their breaks. He interviewed applicants for employment in the meat department, and Joseph Butera hired employees solely on Frank Palazzolo's recommendation. Meat and fish department employees considered him their supervisor. Like Paul Palazzolo and Steve Butera, he signed his own time card rather than punching in. He was paid the $20 per week manager's premium.

Here again, viewed as a whole, the evidence supporting the ALJ's finding that Frank Palazzolo possessed supervisory status is substantial. The fact that he spent a great portion of his time in hands-on work does not undercut his supervisory status. *See American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 896 (7th Cir.1981) (infrequent exercise of supervisory authority does not lessen supervisory status).

### d. Stanley Sokolowski

■ Stanley Sokolowski applied for a job as meat manager at Joe B. Foods. Joseph Butera hired him on March 6, with the intention of making him a meat manager in the future at one of the other stores. Sokolowski had previously worked at Butera Foods, a grocery business belonging to Joseph Butera's family. Shortly after he was hired, Sokolowski became a meat manager trainee. At first, he spent a great deal of time in hands-on meat department work, but as time went on, he began instructing employees in meatcutting, giving other instructions and directions, and working on the meat counter, as did Steve Butera and

Paul Palazzolo. By mid-April, when the Union made its bargaining demand, the employees understood that they were to follow Sokolowski's orders, and they considered him their supervisor. He referred to them as his employees, assigned work to them, and directed and corrected their work. It was Stanley Sokolowski who told Arthur Bradley to follow orders from Frank Palazzolo or be fired. Sokolowski was paid $14.30 per hour and received the manager's $20 per week premium. He signed his own time card rather than punching a timeclock. We think it clear that the ALJ's determination that Stanley Sokolowski was a supervisor was supported by substantial evidence.

■ Joe B. Foods raises two additional arguments concerning the exclusion of the four supervisors. First, he argues that meat managers and back room bosses are customarily included in a meat department bargaining unit, and that the ALJ erred in refusing to allow evidence of this custom. The ALJ acted well within his discretion in excluding the evidence. He emphasized that supervisory status is determined by examining whether a particular employee possesses the *statutory* indicia of supervisory status. An individual's job title or classification does not determine supervisory status; the individual's duties do. In taking this approach the ALJ was on solid ground. *See* 2 C. Morris, *The Developing Labor Law* 1452 (2d ed. 1983) (citing cases). The question of supervisory status is properly resolved by a case-by-case examination of the facts and circumstances. *See, e.g., Copps Food Center, Inc.*, 301 N.L.R.B. No. 55 (1991) (meat manager and assistant meat manager both met statutory definition of supervisor); *Sewell–Allen Big Star, Inc.*, 294 N.L.R.B. No. 6 (1989); *Market Place, Inc.*, 304 N.L.R.B. No. 127 (1991) (meat manager excluded as supervisor from bargaining unit); *Gerbes Super Market, Inc.*, 213 N.L.R.B. 803 (1974) (duties indicated that meat manager was statutory supervisor). The excluded evidence, if relevant at all, would have been of only mar-

ginal value[5] and could not have outweighed the very substantial and very precise evidence of the job duties at issue here.

■ Secondly, Joe B. Foods argues that the ALJ's conclusion that all four men were supervisors produces an unreasonable ratio of supervisors to workers. *See Children's Habilitation Center, Inc. v. NLRB*, 887 F.2d 130, 132 (7th Cir.1989) (ratio of supervisory to nonsupervisory employees an important consideration in analyzing Board's determinations of supervisory status). The ALJ explained that the imbalance was a temporary one attributable to the fact that Joe B. Foods intended to employ two of these men—Stanley Sokolowski and Paul Palazzolo—at other stores when they opened. Moreover, Steve Butera was destined to become general supervisor of all three meat departments. In short, the Board's finding of supervisory status is supported by substantial evidence in the case of all four men, and we therefore uphold it.[6]

e. the utility clerks

■ "The 'community of interest' standard is traditionally the touchstone of the Board's determination whether an individual employee or job classification should be included in a particular collective bargaining unit. The test includes 'a consideration of whether the employee works at regularly assigned hours per week; performs duties similar to those of unit employees; and shares the same supervision, working conditions, wages, and fringe benefits as the unit employees.'" *NLRB v. Speedway Petroleum*, 768 F.2d 151, 155 n. 4 (7th Cir.1985) (quoting *NLRB v. Boston Beef Co.*, 652 F.2d 223, 226 (1st Cir.1981)). Finding that the evidence conclusively proved that the wages, hours, and working conditions of the utility clerks were distinctly different from those of the other meat de-

partment employees, the ALJ concluded that they had a separate and distinct community of interest and excluded them from the bargaining unit. The utility clerks were paid $3.80 an hour, while the meatcutters were paid $13.20 an hour. The utility clerks were not trained in meatcutting and never performed any meatcutting work. They spent most of their working time bagging chickens in a rear hallway behind the meat department or cleaning up. Occasionally they assisted the wrapper by catching packages of meat as they were wrapped, placed trays of meat in the cooler, and placed price labels on wrapped meat. *Cf. El Rancho Market*, 235 N.L.R.B. 468 (1978) ("clean up boy" in meat department was irregular part time worker who did not share community of interests with other meat department workers). Moreover, as the ALJ noted, one of the utility clerks, James Presley, spent from February 18 to May 18 working in the building which was to house the Division Street store. Another, Chris Hill, divided his working time between the grocery department and the meat department.

There is some conflicting testimony about the precise duties of the utility clerks. For example, Stanley Sokolowski testified that the utility clerks learned to wrap. There is, however, no other testimony to that effect, and the ALJ, who found that Sokolowski was not a credible witness, specifically discounted his testimony when it was uncorroborated by other witnesses. *See NLRB v. Illinois–American Water Co.*, 933 F.2d 1368, 1374 (7th Cir.1991) (credibility determinations are to be made by the ALJ and the Board, and ordinarily will not be overturned by a reviewing court). There is more than ample support in the record for the ALJ's findings of fact regarding the duties and working conditions of the utility clerks and its conclusion

---

**5.** *Cf. Queen May Restaurant Corp. v. NLRB*, 560 F.2d 403, 412 (9th Cir.1977) ("the exclusion of marginally relevant evidence is no denial of due process").

**6.** Because we uphold the Board's exclusion of Steve Butera, Paul Palazzolo, Frank Palazzolo

and Stanley Sokolowski from the bargaining unit as supervisors, we do not reach the issue of whether it would be proper also to exclude them on the grounds that they lacked a community of interest with the other members of the bargaining unit.

that they should be excluded from the bargaining unit.

As noted above, the appropriate bargaining unit and the membership of the unit were the contested issues in this successorship case. Because we find that the Ogden Avenue meat department was an appropriate bargaining unit and that the ALJ's determination of the membership of the unit was supported by substantial evidence, we uphold the Board's finding that as Certified's successor Joe B. Foods was obligated to bargain with Local 546.

### C. *The Other Violations*

The Board also determined that Joe B. Foods' unilateral institution of a pension plan violated Section 8(a)(5) of the Act and that Joseph Butera's speech to his employees on April 24, 1987, violated Section 8(a)(1). Joe B. Foods concedes that, if it is determined to be a successor employer, it has no defense to these charges. Accordingly, because we have determined that Joe B. Foods is the successor to Certified, we summarily enforce the Board's orders with respect to these violations. *See U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314 (7th Cir.1991) (uncontested violations of the Act summarily enforced); *Montgomery Ward & Co. v. NLRB*, 668 F.2d 291, 304 (7th Cir.1981); *Justak Bros. & Co. v. NLRB*, 664 F.2d 1074, 1076 (7th Cir.1981).

### Conclusion

For the foregoing reasons, enforcement of the order of the National Labor Relations Board is granted.