# In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 05-1289, 05-1557

SHARES, INC. and WAP, LLC,

Petitioners,
Cross-Respondents,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent,
Cross-Petitioner,

and

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW,

Intervenor.

_____

Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
No. 25-CA-28771

_____

ARGUED SEPTEMBER 27, 2005—DECIDED JANUARY 9, 2006

_____

Before CUDAHY, POSNER, and EASTERBROOK, *Circuit
Judges.*

CUDAHY, *Circuit Judge.*  Shares, Inc. (Shares) is a non-profit corporation that trains and employs disabled individuals who perform primarily industrial tasks for customers. Wellman Automotive Parts (Wellman) retained Shares' services to package the glow plugs[1] that it manufactured for diesel engines. When Wellman entered bankruptcy in 2003, Shares decided to move to the manufacturing side of the glow plug business. Toward that end, Shares formed a new company (WAP, LLC), purchased Wellman's machinery and hired many of Wellman's former employees. These employees belonged to the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW). When Shares refused to bargain with the UAW, the union filed a complaint with the National Labor Relations Board (NLRB). The NLRB concluded that Shares is Wellman's successor and is therefore obligated to bargain with the UAW under 29 U.S.C. § 158(a)(5) and (1). Shares petitions this Court for review, and the NLRB cross-applies for enforcement of its bargaining order against Shares. We deny Shares's petition and grant the NLRB's cross-application.

## I.  Background

Shares is an Indiana corporation that employs approximately 300 individuals in its Industrial Services Group, about 250 of whom are disabled. These 300 employees are divided into six subsets, each of which specializes in work on different products, including die-cast aluminum parts, DNA child-identification kits and glow plugs. Disabled employees

---

[1]   A glow plug is essentially a spark plug that warms the cylinders of a diesel engine prior to ignition and initially ignites the fuel. Once the engine is running, the mixture of fuel and air ignites spontaneously when the piston compresses it.

(referred to as "consumers") and nondisabled employees ("staff") work under various conditions and terms of employment, especially with respect to compensation. Staff receive a standard hourly wage while consumers receive an individual hourly wage based on their productivity. In some circumstances, consumers perform well enough to be hired as staff.

Wellman bought a manufacturing facility in Shelbyville, Indiana, in 1988. The UAW had represented employees at that facility since 1972 through a number of changes in ownership. Wellman used the facility to manufacture glow plugs and contracted the task of packaging the glow plugs with Shares. In February 2003, however, Wellman filed for bankruptcy. The bankruptcy court appointed Shares to oversee the glow plug operation, which it did for about seven weeks.

During those seven weeks, Shares decided to move into glow plug manufacturing for profit in order to supplement its income and thereby better support its nonprofit activities. Accordingly, on April 28, 2003, Shares purchased Wellman's assets that were used to produce glow plugs out of bankruptcy. In order to maintain its not-for-profit status, Shares created WAP, LLP, a wholly owned for-profit subsidiary to own and manage the glow plug operation.

Pursuant to the purchase agreement, Wellman discharged its glow plug employees on Friday, April 25, 2003. Shares resumed glow plug production the following Monday and hired eleven employees to work on the glow plug production line. Seven of those employees were Wellman employees discharged on April 25. Three others were Wellman employees who had been laid off but who held recall rights under the expiring collective bargaining agreement. The ten former Wellman employees continued working on the same orders they had been working on the previous workday.

On May 9, 2003, a representative of the UAW sent a letter to Shares's general manager asserting that Shares was a

successor to Wellman and demanding that Shares recognize and bargain with the union. Shares disputed these claims and refused to bargain. The UAW then filed a complaint with the NLRB. An administrative law judge recommended that Shares recognize and bargain with the UAW. A panel of the NLRB agreed and entered such an order. Specifically, the NLRB found that Shares violated 29 U.S.C. § 158(a)(5) and (1) by refusing to recognize and bargain with the UAW as the exclusive representative of the glow plug manufacturing employees. Shares petitions this Court for review, and the NLRB cross-applies to enforce its order.

## II. Discussion

We review a disposition of the NLRB with substantial deference. Under this standard of review, we ask only whether the record contains substantial evidence to support the NLRB's factual findings and whether its application of the law to the facts is reasonable. *E.g.*, *L.S.F. Transp., Inc. v. NLRB*, 282 F.3d 972, 980 (7th Cir. 2002); *Canteen Corp. v. NLRB*, 103 F.3d 1355, 1360-61 (7th Cir. 1997). The question before the NLRB and before us on review is whether Shares is a successor employer to Wellman and therefore obligated to bargain with the UAW.

Under the National Labor Relations Act, a new employer, succeeding to the business of another, is obligated to bargain with the union representing the predecessor's employees. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41 (1987); *NLRB v. Joe B. Foods, Inc.*, 953 F.2d 287, 292 (7th Cir. 1992). The obligation to bargain is triggered when: (1) there is "substantial continuity" between the enterprises of the predecessor and the new employer; (2) the unit of employees comprising the new operation remains the appropriate unit for collective bargaining; and (3) the new employer's workforce contains a majority of the predecessor's former employees at a time when the new workforce has

reached a "substantial and representative complement." *Fall River Dyeing & Finishing Corp.*, 482 U.S. at 43, 46-47; *Joe B. Foods, Inc.*, 953 F.2d at 292-93. It is well established that a new employer has a duty to bargain when it makes a conscious decision to maintain generally the same business and to hire a majority of its employees from its predecessor. It is equally well established that in conducting the successorship analysis, it is appropriate to "keep[ ] in mind the question whether 'those employees who have been retained will understandably view their job situations as unaltered." *Fall River Dyeing & Finishing Corp.*, 482 U.S. at 43 (citing *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 184 (1973)).

## A.  Substantial Continuity

The first element of the successorship analysis—whether the two enterprises share a "substantial continuity"—focuses on factors including whether the business of both enterprises is essentially the same; whether the employees of the new company are doing the same job under the same working conditions with the same supervisors; and whether the new entity has the same production process, produces the same products and basically has the same body of customers as the former company. *Id.* at 43; *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001). On this basis, the NLRB reasonably concluded that the glow plug employees would view their jobs as unaltered. Their last day of unemployment with Wellman was Friday, April 25, 2003, when they made glow plugs using machinery at a facility in Indiana. The following Monday, when Shares employed them, those same employees returned to the same facility and continued to manufacture glow plugs for the same customers, using the same machinery they had employed the previous workday. From the employees' perspective, then, it seemed that little had changed but the signatory of their paychecks.

Shares, however, contends that because it (unlike Wellman) is a nonprofit corporation, the companies cannot be substantially the same. Shares also contends that the glow plug employees perform different jobs at Shares than they did at Wellman, since they are now cross-trained to perform a variety of tasks and some have even moved to different divisions. Shares finally contends that it cannot be Wellman's successor since its pay structure differs from Wellman's and since it did not simply inherit Wellman's old customers but actively reacquired them.

These arguments all fail in that they rely on an interpretation of successorship law that downplays the importance of the employee-perspective model. While it is true that Shares's overarching purpose is to assist the disabled, its glow plug operation is conducted explicitly for profit. Its motivations for entering this activity may have been different from the motivations of other for-profit enterprises, but that consideration is not particularly relevant to successorship analysis. Again, we must compare the two jobs from the employees' perspective. Their employer's business principles might affect their view of their work, but they do not determine its basic nature; whether the enterprise is manufacturing glow plugs to help the disabled or to help the company's bottom line (or, in this case, both), the nature of the manufacturing position is fundamentally to manufacture glow plugs to be sold at a profit.

Likewise, the fact that these positions are not purely identical and that Shares did not simply absorb Wellman's customers does not disallow its position as Wellman's successor. We have previously rejected the notion that jobs must be identical; where employees "perform[ ] largely the same tasks, under comparable conditions, and under a number of the same supervisors," the continuity is sufficient to satisfy this inquiry. *Bloedorn*, 276 F.3d at 289. A seamless transition might provide an even clearer case for successorship, but it is certainly not a necessary precondition. *See,*

*e.g.*, *Pa. Transformer Tech., Inc. v. NLRB*, 254 F.3d 217, 224 (D.C. Cir. 2001) (finding successorship despite a two-year production hiatus and a number of other factors not present here).

### B. Appropriate Bargaining Unit

The second element of the successorship test focuses on what constitutes the appropriate unit for collective bargaining. "[T]he selection of an appropriate bargaining unit lies largely within the discretion of the [NLRB], whose decision 'if not final, is rarely to be disturbed.'" *S. Prairie Constr. Co. v. Operating Eng'rs Local No. 627*, 425 U.S. 800, 805 (1976) (quoting *Packard Motor Co. v. NLRB*, 330 U.S. 485, 491 (1947)); *see also* 29 U.S.C. § 159(b). We will uphold the NLRB's determination unless Shares is able to show that the bargaining unit is clearly inappropriate. *Dunbar Armored, Inc. v. NLRB*, 186 F.3d 844, 847 (7th Cir. 1999).

Here, the NLRB concluded that Shares's glow plug employees constitute the appropriate bargaining unit because they are the only employees who work in a for-profit division of Shares. These employees share a community of interests different from the interests of other employees who work in divisions having a combination of consumers and staff. That Shares created a separate entity to allow the glow plug production employees to work for profit underscores their differences from the rest of the organization, and it is logical to conclude that the for-profit employees might hold interests differing from the nonprofit employees. *See, e.g.*, *Davis Mem'l Goodwill Indus., Inc. v. NLRB*, 108 F.3d 406, 410 (D.C. Cir. 1997) (stating that employees who work for a primarily rehabilitative division are likely to have interests that are very different from or even antagonistic toward for-profit employees).

Shares points to a number of factors suggesting that its glow plug operation is an integrated segment of the com-

pany. In some circumstances, these factors might suggest that the entire operation is a single unit appropriate for collective bargaining. In the present situation, however, Shares has failed to establish that the for-profit and non-profit employees are similarly situated. Given this critical fact, nothing suggests that the NLRB abused its discretion in selecting the glow plug employees as the appropriate bargaining unit. Shares thus meets the second element of the successorship test.

### C. Substantial and Representative Complement

The third and final issue for us to consider is whether the NLRB erred by concluding that Shares reached a substantial and representative complement of its employees on April 28, 2003—the Monday after Wellman ceased operations in bankruptcy. This consideration is one of timing; it establishes the moment when the determination of the composition of the successor's workforce is to be made, and it identifies the date when a successor's obligation to bargain arises. "If, at this particular moment, a majority of the successor's employees had been employed by its predecessor, then the successor has an obligation to bargain with the union that represented these employees." *Fall River Dyeing & Finishing Corp.*, 482 U.S. at 47.

In order to determine when a substantial and representative complement arises, the NLRB considers whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production. The NLRB also considers the size of the complement on that date and the time expected to elapse before a substantially larger complement would be employed, as well as the relative certainty of the employer's expected expansion. *Id.* at 48-49. In general, if a new employer continues operations uninterrupted, the proper substantial and representative complement determi-

nation should take place at the time of transfer of control. *Id.* at 47; *see also 3750 Orange Place Ltd. P'ship v. NLRB*, 333 F.3d 646, 663 (6th Cir. 2003); *Prime Serv., Inc. v. NLRB*, 266 F.3d 1233, 1239-40 (D.C. Cir. 2001).

Although Shares contends that it initially did a minimum amount of work merely necessary to avoid defaulting on Wellman's outstanding orders with later increased production as Shares ramped up its glow plug operation, it is undisputed that manufacturing operations never ceased. The April 28 labor complement contained sixty-one percent of Shares's ultimate workforce and was a group large enough to deal with Wellman's outstanding orders. This complement was far from skeletal. Longstanding precedent requires only that the complement be representative, not full. *Fall River Dyeing & Finishing Corp.*, 482 U.S. at 50-51; *3750 Orange Place Ltd. P'ship*, 333 F.3d at 664 (finding that the NLRB reasonably chose to measure the company's substantial and representative complement at a time when sixty-three percent of the eventual full workforce was employed). Shares is unable to point to any fact to suggest that the NLRB abused its broad discretion in fixing the substantial and representative complement date at April 28, particularly in light of the uninterrupted nature of the work. Thus, the NLRB's determination on this point was reasonable.

### III.  Conclusion

In sum, we DENY Shares's petition and GRANT the NLRB's cross-application to enforce its order requiring Shares to bargain.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*