NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BLISS AND LAUGHLIN STEEL
COMPANY, INC., Respondent.

No. 83–2798.

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1984.

Decided Feb. 5, 1985.

Richard Cohen, Elliott Moore, NLRB, Washington, D.C., for petitioner.

Douglas A. Darch, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for respondent.

Before CUDAHY, EDWARDS,[*] and ESCHBACH, Circuit Judges.

ESCHBACH, Circuit Judge.

In this petition for the enforcement of an order of the National Labor Relations Board ("Board"), respondent Bliss and Laughlin Steel Co., Inc. ("B&L") challenges the Board's finding that B&L violated sections 8(a)(1), (3), and (4) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1), (3), and (4), in discharging two of its employees, Steven Hughes and Michael Nameche. For the reasons stated below, we grant the Board's petition for enforcement of its order.

## I

### A. Events Leading up to the Discharges

B&L maintains a place of business ("plant") in Batavia, Illinois, that is engaged in the manufacture of cold finished steel bars. At the time of the discharges in question, the plant employed about fifteen production employees—including three working foremen—in three departments, each of which was under the supervision of a working foreman.

Thomas Emerick was the plant superintendent at the time of the discharges and had held that position since April 1980. From April 1980 to October of that year, Emerick's superior was plant manager Viewig. Viewig left the Batavia facility in the fall of 1980. Between October 1980 and May 1981, Kenneth Oakes, the administrative manager and controller, assisted Emerick in the operation and administration of the plant.

Mike Nameche, the first employee hired by B&L when the plant was opened in 1977, was a long-time union activist and was deeply involved in the two attempts, in 1978 and 1979, of Local 200 of the Allied Crafts Division of the United Textile Workers of America to obtain representation at the plant. Nameche acted as an observer for the union in both elections. The 1978 election was set aside, *B.L.K. Steel, Inc.*, 245 N.L.R.B. 1347 (1979), and Local 200 did not prevail in the 1979 election. Relations between B&L and Nameche were not always amicable. In the previous proceeding, for example, the Board found that B&L had engaged in a number of unfair labor practices during the Local 200 campaign, which included a threat of reprisal, i.e., "discipline or discharge ... for tardiness," to Nameche for his union activities. *Id.*, 245 N.L.R.B. at 1352.

In developing a response to the organizational efforts of its employees, B&L procured the services of West Coast Industrial Relations Association ("WCIRA"). This firm, as an agent of B&L, was also found in the prior Board decision to have engaged in unfair labor practices. *See id.* A number of letters from WCIRA were introduced in the instant proceedings. Correspondence under the date of August 27, 1979, and addressed to Frank Aughnay, a senior vice-president of operations at B&L, recommended the following course of action:

> Consider offering a working foreman job to Mike Nameche, the union's organizer, so as to attach him to management objectives ..., thereby decreasing his ability to campaign against the company and forcing him to place supervisory type pressure on his fellow union adherents.

A second letter, dated October 25, 1979 and addressed to then plant manager Viewig, stated:

nation.

Our proposed remedy is simple: ... after the election objections and challenged ballots are resolved, use the work rules in the handbook, and build cases on, and terminate the following employees: [Nameche and others] .... These workers should be replaced with non-union prone employees.

This letter also suggested that then acting plant supervisor Ramm be replaced "if a stronger production manager can be found or provide him with leadership training if he can't be replaced." Ramm was in fact demoted in April 1980 and was replaced by Emerick.

A third letter, dated January 7, 1980, and addressed to Aughnay, stated:

Unfortunately, as long as Mike Namesch [sic] is employed at [B&L], local management there must devote an inordinate amount of time and attention to employee relations matters.

According to Ramm, WCIRA participated in the preparation of the employee handbook. Ramm also referred to rumors at the plant concerning a "hit list," allegedly drawn up by WCIRA, that singled out certain union supporters, including Nameche, for termination. Ramm discussed the matter with Emerick after Ramm had been demoted.

Nameche was the leader of the third effort to organize B&L's employees and was aided by Steven Hughes, a B&L employee since March 1979. This campaign for representation—now by the United Steelworkers of America ("Steelworkers") —was initiated in March 1980 and began to heat up in November of that year with the circulation to the employees of a letter prepared by Nameche requesting that the employees sign union-authorization cards. The Steelworkers filed an election petition in December 1980.

From early November 1980, B&L met periodically with Nameche and Hughes in an attempt to give them greater duties and responsibilities. In a pre-election proceeding, B&L contested the inclusion of Nameche, Hughes, and another working foreman in the election unit on the grounds that these employees were supervisors under the Act and thus not qualified to vote. Nameche and Hughes testified at a pre-election representation hearing on January 2, 1981, that they were employees who were properly included in the election unit. The Regional Director found that the three working foremen were employees within the meaning of the Act and directed that they be included in the unit; B&L filed a request for review. In an order dated March 2, 1981, the Board concluded that the status of these employees should be resolved through the ballot-challenge procedure.

The election was held on March 2, 1981. Of the fourteen eligible employees, six voted in favor of, and four voted against, representation. Thus, the ballots of the three disputed employees were sufficient to affect the result. Shortly after the election, B&L filed objections in which it alleged that Nameche and Hughes as agents of the union engaged in acts of misconduct.

A post-election hearing was held on March 30 and April 7–9, 1981, to resolve these issues. Nameche and Hughes again testified on behalf of the union that they were not supervisors and that they had not committed any acts of misconduct. The hearing officer recommended that B&L's voting challenges and objections to the conduct of the election be overruled, and the Board adopted the recommendations of the officer. The union was certified on February 12, 1982, some 347 days after the election.

On March 25, 1981, two days prior to its decision to dismiss Hughes, B&L filed an unfair labor practice charge alleging that Nameche and Hughes, as agents of the union, had restrained and coerced employees in the exercise of the latter's rights under section 7 of the Act. The Regional Director refused to issue a complaint and the General Counsel's office of appeals denied the appeal.

## B. The Discharge of Hughes

### 1. *Facts*

On March 27, 1981, the B&L management decided to terminate Steven Hughes.

At the time of his discharge, Hughes was working as a foreman in the raw materials and pickling department. He was ostensibly dismissed for refusing to review and sign a contract on behalf of B&L for "waste transportation and disposal." The termination notice, signed by Oakes, first described Hughes's responsibilities and duties in accordance with B&L's view, which it was arguing in the pending post-election representation proceedings, that Hughes was a supervisor under the Act. B&L subsequently abandoned this position, but still maintained in the instant proceeding that Hughes's duties were such at the time of his termination that he was required to review and sign the contract. The termination notice also stated that, under the "disciplinary policy" set forth in the employee handbook, Hughes's refusal to sign the document was "gross insubordination."

Hughes was responsible for the removal and replacement of the sulphuric acid used in his department. The actual servicing of the acid was performed by an independent contractor, Mr. Franks, Inc. ("Mr. Franks"), which had been performing this service for some time. Hughes regularly dealt with Mr. Franks and was the so-called "vendor contact" between B&L and the contractor. When the iron concentration in the acid bath would reach a certain level, Hughes would fill out a purchase requisition and give it to Emerick to sign or initial; Hughes would then turn it in and call Mr. Franks. Hughes, however, had no responsibility for the purchase-order procedure that provided payment to Mr. Franks.

In December 1980, Hughes received a contract for waste removal, as well as other documents, from Mr. Franks. He turned those materials over to Oakes, who then forwarded them to B&L's attorneys. No further mention of the contract was made until March 1981, when Oakes brought the contract to Hughes, asked him to "look it over," and said that Hughes could sign the document if he wanted to. Hughes responded that he did not think it

was his job to sign anything on behalf of the company. Hughes later attempted to return the contract, but Oakes now insisted that Hughes sign it. On March 24, Oakes asked Hughes if the latter had reviewed the contract. Hughes again told Oakes that he did not feel that he should sign the document. Oakes testified that he next told Hughes the contract was needed by the end of the week and that Hughes said it would be completed by then.

On Friday, March 27, 1981, at about 1 p.m., Oakes again spoke with Hughes about the contract and insisted that the matter be resolved by the end of the day. At about 3 p.m., Hughes, accompanied by Nameche, came into Oakes's office. Hughes returned the contract and stated that he was refusing to sign "on advice of counsel." [1] Hughes testified as to the reasons for his action: "At that particular time we were going to hearing [sic] to decide on our supervisory status. The pressure that last day was also my opinion if I sign it, the damn thing would end up the following hearing day in court. At the time I didn't feel it was my job to sign that contract."

Hughes was in fact present at the post-election hearing of March 30; when he came to work on March 31, he was given his termination notice. Hughes told Oakes then that the latter had baited Hughes. Oakes replied that it did not matter whether Hughes had been baited or not, but that Hughes had refused to sign, which was "gross insubordination" that would not be tolerated. Oakes testified that he and Emerick had made the decision to terminate Hughes and that Oakes had not discussed the contract with Emerick, even though the latter was responsible for overseeing all plant operations, including acid and sludge removal. There is no question that Oakes, in March 1981, knew that Hughes's status was vigorously contested. After the discharge of Hughes, Oakes never again looked at the contract prior to his departure from the plant in May 1981, saying

---

**1.** Hughes's "counsel" was, in fact, Nameche.

that he "never had the time." Neither he nor any other official of the B&L plant signed the document before he left.[2]

### 2. Decision of the ALJ

The ALJ concluded that Hughes's refusal to sign the contract simply provided a pretext for the discharge and that B&L's primary motivation for termination was Hughes's union activities, as well as his testimony, which was contrary to the interests of B&L, at the Board proceedings.

### C. Discharge of Nameche

#### 1. Facts

In August 1980, B&L instituted a "no fault" tardiness and absenteeism program. Under this plan, an employee was entitled to "credits" in each of two categories (absence and tardiness/early departure) for each month during which he maintained a perfect record; a total of five credits could be accumulated. When an employee arrived late or left early, he was given one "demerit" for each violation. No excuses were accepted, except for injuries on the job or a death in the family. When the employee had two demerits in excess of his earned credits, he was given a first written warning. With three excess demerits, he received a second written warning. With four demerits in excess of credits, the employee was terminated. Of course, an employee with three demerits could, after one full month without a violation, cancel a demerit and the accompanying second written warning.

Nameche was discharged on September 29, 1981, after he allegedly arrived ten minutes late for work that day, and was in fact the first employee at B&L to be terminated under the "no fault" program. In

August 1981, he had been given a second written warning; this warning, however, would have been cancelled if Nameche had maintained his "perfect record" for the month of September.

On September 29, Nameche rode into work with Al Hammer, a temporary employee of B&L. The two were listening to the radio on the way to the plant. Hammer testified that he heard an announcement over the radio that it was 6:56 a.m. shortly before he pulled into the plant's parking lot. Nameche testified that, just as the car was pulling into the parking space, he heard an announcement that it was 6:58 a.m. According to the testimony of either man, Hammer and Nameche would have entered the plant before 7 a.m. Hammer went directly to the production floor. Nameche stopped in the locker room to put on his hard hat and safety shoes. On his way to the floor, Nameche encountered Emerick, who directed Nameche to a particular part of the plant. Although Emerick was checking the time that each employee was arriving in the work area, he made no comment at that time to either Nameche or Hammer about being late.

At 10 a.m. on the day of the discharge, maintenance supervisor Sipek asked Nameche what time the latter had arrived at work. Nameche said he had arrived at 7 a.m. When Nameche asked why Sipek had posed the question, the latter replied, "Well, I guess the girls in the office need it." [3]

Just before noon, Sipek asked Nameche to come to Emerick's office. Emerick was at that time talking with Tom Daugherty, a B&L official. After Daugherty left, Nameche and Sipek were ushered in to see

---

2. A change in the corporate structure of the plant was announced in April 1981, and apparently another office subsequently became responsible for documents like the Mr. Franks contract. The ALJ found, however, and we agree, that this change, which was not effectuated until some time in June or July 1981, does not explain why no action was taken on the Mr. Franks contract at the Batavia plant prior to Oakes's departure. Indeed, Oakes, who left the plant in May 1981, testified that "I suggested

before I left that somebody would have to—who was familiar with that type of operation, acid removal, would have to review it and see if it was worth signing."

3. Sipek denied that this conversation ever occurred; the ALJ, however, did not credit his testimony and found Nameche to be a credible witness.

Emerick, who then terminated Nameche, ostensibly for arriving late at the plant.

### 2. Decision of ALJ

The ALJ concluded that the discharge was a pretext and that the prime motivation was B&L's disapproval of Nameche's union activities. The ALJ first found that the meaning of "tardiness" at the plant was unclear. The "no fault" program contained no definition of the term. In addition, it was unclear from prior practices at B&L whether the employees were supposed to be at their work stations or simply at the plant by 7 a.m. There was also evidence that the employees had a "grace period" of five minutes. The ambiguity was compounded by the fact that the firm did not have a mechanical timeclock; the employees were supposed to write their starting times on their timecards. There was also evidence that Emerick often readjusted clocks at the plant. Employee attendance records were inaccurate. The management had ceased to post the demerit status of the employees. There was also extensive evidence of discretion in the application and laxity in the administration of this "no fault" policy.

### D. Decision of the Board

With one minor reservation,[4] the Board affirmed the findings and conclusions, and adopted the order, of the ALJ. 266 N.L.R.B. 1165 (1983).

## II

### A. Burden of Proof Below and Standard of Review

■ In *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court approved the test articulated by the Board in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Under the current standard, the General Counsel has the burden of proving that the employee's protected conduct was "a substantial or a motivating factor in the discharge." *NLRB v. Transportation Management Corp.*, 462 U.S. at 400, 103 S.Ct. at 2473. The employer, of course, may attempt to rebut the General Counsel's evidence. However, even if the rebuttal is unsuccessful, the employer may avoid being held in violation of § 8 of the Act by proving by a preponderance of the evidence that the discharge "rested on the employee's unprotected conduct as well and that the employee would have lost his job in any event." *Id.*, 462 U.S. at 400, 103 S.Ct. at 2473.

■ It is well established that our review of the decision of the Board is a deferential one. *See NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963). The finding that an unlawful motivation served as a basis for the discharge of Hughes and Nameche must be upheld if it is reasonable and supported by "substantial evidence on the record as a whole." *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We may not, as a reviewing court, "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo*." *Id.*, 340 U.S. at 488, 71 S.Ct. at 465.

### B. Analysis

B&L has launched a three-pronged attack on the Board's findings with reference to the discharge of both Hughes and Nameche. First, B&L argues that the Board failed to establish an anti-union animus on the part of B&L. Second, B&L claims that, even if there was such an animus, the General Counsel presented insufficient proof of a causal connection between that animus and the discharge of these employees. Finally, B&L asserts that its own

---

**4.** In its order affirming the ALJ's decision, the Board found it "unnecessary to rely on the [ALJ's] animus finding insofar as it is based on employee Miser's testimony that [B & L's] officials had stated that union activists Nameche and Hughes were being watched because of a complaint by Miser that they were harassing him." 266 N.L.R.B. at 1165 n. 2.

proof established that these employees would have been terminated even if they had not been involved in protected activity.[5]

B&L's arguments, when stripped to their essential elements, amount to nothing more than an attack on the credibility findings of the ALJ and on the relative weight he assigned to certain evidence. Reconsideration from a sterile transcript of the reliability of witnesses and the force of the evidence, however, is ordinarily not the appropriate function of a reviewing court.

■ With reference to the presence of an anti-union "animus" on the part of B & L, there is more than substantial evidence in the record to support the ALJ's conclusion that such a sentiment existed and that it was a primary motivation in the discharge of both Hughes and Nameche. The letters from WCIRA are most damaging and B & L appears to have lost sight of the fact that the General Counsel did not have to show that WCIRA and B & L were acting in concert at the time of the discharges. B & L's implementation of many of the WCIRA recommendations was quite telling, and the ALJ was entirely justified in concluding that the congruence between the proposals of WCIRA and the actions of B & L was not the product of coincidence. It must also be noted that B & L filed several meritless charges against both Hughes and Nameche. B & L seems to argue that, absent direct and uncontroverted evidence of an anti-union animus, the General Counsel has not met its burden. This is, of course, inaccurate and unrealistic. We find the ALJ's quotation of the Fifth Circuit's decision in *NLRB v. Aero Corp.*, 581 F.2d 511, 515 (5th Cir.1978) (quoting *NLRB v. Neuhoff Bros., Packers, Inc.*, 375 F.2d 372, 374 (5th Cir.1967)), to be quite apt: "Today the employer seldom engages in crude, flagrant derelictions. Nowdays it is usually a case of more subtlety, perhaps the more effective, and certainly the more likely to escape legal condemnation." The conclusions that B & L harbored an anti-union animus and that this was the primary motivation for both of the disputed discharges are substantially supported by the evidence presented by the General Counsel.

■ The only serious question is whether B & L demonstrated that the discharge "rested on the employee's unprotected conduct as well and that the employee would have lost his job in any event." *NLRB v. Transportation Management Corp.*, 462 U.S. at 400, 103 S.Ct. at 2473. In the case of Hughes, the evidence amply supports the ALJ's conclusion that Hughes's refusal to sign the Mr. Franks contract provided a convenient pretext for the discharge and that the actions of B & L's management belie the assertion that this employee's signature was needed on the contract or that the signing of such contracts was within the scope of his job responsibilities.[6] To the extent that this additional obligation was imposed in response to the protected activities of Hughes, it was unlawful. Thus, Hughes's refusal to acquiesce in B & L's attempt to enlist his help in creating evidence favorable to B & L's position in the upcoming hearing was entirely justifiable.

■ There is more conflicting testimony with regard to the discharge of Nameche. However, we conclude that there was substantial evidence in support of the Board's finding of an unlawful discharge and that

---

**5.** B & L concedes that both Hughes and Nameche had engaged in union activities and that B & L was aware of those activities. Respondent's Brief at 15 n. 11, 32 n. 20. However, B & L's continued assertion that these employees were "supervisors" within the meaning of the Act and thus unprotected is indeed puzzling, as Respondent stipulated below that, for the purposes of the instant proceeding, Nameche and Hughes were not statutory "supervisors." We, therefore, will entertain no argument of B & L to the contrary and interpret B & L's position as a concession that the discharged employees were engaged in protected activity and that B & L was aware of these activities.

**6.** Even B & L's counsel at oral argument, in responding to the question whether Hughes had signed any other contract like the one at issue, conceded that there had been no previous contract similar to it.

it was indeed the most plausible interpretation of the record. The ALJ's determination depended primarily on his credibility findings and we find no reason to disturb these. Thus, once the discredited testimony is eliminated, it is apparent that Nameche did arrive on time on September 29.

■ Our finding that the discharge was unlawful would not be changed, however, even if we were to conclude that Nameche did not arrive on time, because the evidence conclusively shows that the tardiness program was subject to lax administration and discriminatory application. Although B & L argues that it had instituted a "no fault" program, it is quite clear that a considerable amount of discretion was exercised by the management. In addition, the inaccuracies in record-keeping impugn the integrity of the entire program. Thus, even if we were to find that there was not substantial evidence to support the finding that Nameche did in fact arrive on time the day of his discharge, it is clear nonetheless that he was singled out for termination because of his pro-union activities.

We have carefully considered all of B & L's remaining arguments and have found them to be without merit.

For the foregoing reasons, we grant the Board's petition for enforcement of its order.