**CENTRAL TRANSPORT, INCORPORAT-ED, Central Cartage, Company and Big John Incorporated, Petitioners, Cross-Respondents,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

Nos. 92–3072, 92–3055.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1993.

Decided June 8, 1993.

Rehearing and Rehearing En Banc Denied July 8, 1993.

James H. Hanson, Scopelitis, Garvin, Light & Hanson, Indianapolis, IN, Timothy K. Carroll (argued), Dykema Gossett, Detroit, MI, for Cent. Transport, Inc., Cent. Cartage, Co. and Big John Inc.

Julie Broido, James M. Stephens, N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, Collis Suzanne Stocking, John D. Burgoyne, John D. Burgoyne (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, William T. Little, N.L.R.B., Region 25, Indianapolis, IN, for N.L.R.B.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and REAVLEY, Senior Circuit Judge.[1]

BAUER, Chief Judge.

Central Transport, Inc., Central Cartage, Co. (jointly "Central"), and Big John Incorporated petition this Court for review of an order issued by the National Labor Relations Board. The Board found that Central and Big John committed four violations of the National Labor Relations Act ("the Act"). 29 U.S.C. §§ 151–160. The Board filed a cross-petition for enforcement of the order. For the following reasons, we enforce the order as to Big John, and enforce in part and vacate in part the order against Central.

## I.

Central Transport and Central Cartage are subsidiaries of Centra Inc. Both are trucking companies. Central Transport ships freight in interstate commerce between cities to shipping terminals. After the freight is delivered to the terminals, Central Cartage delivers it to intra-city locations. Central leased mechanics from Big John, a personnel corporation, to maintain trucks at its Roanoke, Indiana terminal. Central Transport and Central Cartage have stipulated that they are a single employer for purposes of this litigation.

Central leased three new mechanics from Big John in late 1987 and early 1988. Ray Carr, a Central employee and the Roanoke shop manager, hired and supervised the mechanics. Big John was paid on a cost-plus basis: it paid the leased employees and withheld the appropriate taxes; it passed these costs to Central and received a fixed percentage in compensation. When they were hired, the terminal mechanics were not represented by a union. Ray Carr informed each new mechanic that the shop was non-union and that the shop would close if employees brought in a union. Five mechanics worked for Central at the Roanoke terminal in April 1989. Three of them signed union authorization cards with Local 414 of the Chauffeurs, Teamsters & Helpers Union, which is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("the Union"). The Union's business agent, Michael Hinton, sent a letter to "Mr. Ray Carr, Big John, Inc." on April 18, 1989, informing him of the Union's election and requesting recognition. Hinton Letter, Government Exhibit (G. Ex.) 7. The Union conducted an election pursuant to NLRB regulations on April 19, and the mechanics elected the Union by a vote of 3 to 2. On April 21, 1989, the Union petitioned the Board for certification of its representation of the mechanics. The Board issued the certification on May 30, 1989. Big John was the only employer named in the petition and the Board's Certification of Representation. G. Exs. 3(a), (b), & (c). Central was not made a party to the election and certification proceedings.

After Carr received Hinton's letter, he asked mechanics Bell and Murdock whether they signed union authorization cards. Both falsely denied signing the cards. The terminal manager, Jim Bowen, questioned mechanic Melton. Melton was the union election observer. Bowen asked Melton if he voted for the Union, and to identify the

1. The Honorable Thomas Reavley, Senior Judge for the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

mechanics who did. After the election, Carr told mechanic Bell that the shop would close because the employees elected to have union representation.

On July 1, 1989, Hinton wrote to John Anger, Big John's President, to inform him of the Union's certification by the Board and to arrange a meeting. On July 14, 1989, Hinton met with Anger to discuss the terms of the mechanics' collective bargaining agreement. Hinton gave Anger a copy of the Union's proposal for pension and welfare benefits, the Uniform Indiana Automotive Maintenance Agreement (the "blue book"). The blue book sets forth the agreement reached between the Indiana Conference of Teamsters and the Indiana Motor Carriers Labor Relations Association. Hinton told Anger that the Union could agree to a wage rate lower than that given in the blue book and, during the administrative proceedings, the Board found that Hinton also informed Anger that all the elements of the Union's proposal were negotiable. *Central Transport, Inc. v. NLRB*, 1992 WL 17779 (NLRB), 139 L.R.R.M. 1404 (Jan. 27, 1992), at *3 n. 5 (hereinafter "Board op."); *Central Transport, Inc. v. NLRB*, 1992 WL 17779 (NLRB) at *5 (July 11, 1991) (included as Appendix to Board op.) (hereinafter "ALJ op.").

Anger informed Hinton that he needed to discuss the Union's proposals with Central because Central would be responsible for any increase in labor costs. Anger discussed the proposal with Central Vice President Dennis Toca. According to Toca and Anger's calculations, the expanded benefits the Union requested would increase the cost of operating the Roanoke terminal $200 per week, per man. On May 31, 1989, Toca wrote Anger to warn him that Central would not absorb cost increases due to the unionization. On August 17, 1989, Toca wrote Anger another letter:

> We are experiencing a severe downturn in overall business in both the truckload and LTL areas. Consequently, we are looking to keep costs in line and cut whenever necessary.
>
> Therefore, we cannot agree to your request for $200.00 per week per man. We will be forced to discontinue using Big

John Inc. in Ft. Wayne effective September 1, 1989 and will undoubtedly absorb the work in other shops in an effort to keep costs in line.

Toca Letter to Anger of 8/17/93, G. Ex. 5. Neither Big John nor Central made counteroffers to the Union and there were no negotiations after the initial meeting between Anger and Hinton. Central closed the terminal on September 1, and mechanics Bell, Murdock, and Melton (the mechanics who voted for the Union) were laid off. One mechanic had already left Roanoke, and the fifth was transferred to another terminal.

Hinton, on behalf of the Union, contacted Anger on September 8, 1989 to request bargaining over the effects of the closure of the terminal. On October 8, Anger informed Hinton that he would be unavailable to meet before October 18. The work performed by the Roanoke facility was transferred to a new terminal in Kokomo, Indiana. On October 26, 1989 and in February 1990, Central contacted the three laid-off mechanics directly to offer them jobs at different facilities.

The Union filed separate unfair labor practice charges against Big John and Central. *See* Board Consolidation Order, Petitioners' Appendix at 19–20. On October 2, 1989, the charges were amended to allege that Big John and Central were joint employers. On November 13, 1989, the Regional Director of the Board ruled that Big John and Central were joint employers, consolidated the charges against them, and issued a complaint. *Id.* The complaint charged Big John and Central with unlawful interrogation of and threats to employees, unlawful discharge or layoff of employees, and unlawful refusal to bargain in good faith, violations of Sections 8(a)(1), (3), and (5) of the Act. 29 U.S.C. §§ 158(a)(1), (3), & (5). An administrative law judge (ALJ) heard the consolidated cases on March 4, 5, and 6, 1991.

The ALJ determined that Central employees Carr and Bowen improperly interrogated employees Bell, Murdock, and Melton about their support for, and involvement in, the Union election. The ALJ found that these interrogations violated Section 8(a)(1) of the Act. ALJ op. at *5. The ALJ also found that Carr threatened mechanics Berger and

Bell with shop closure if the Union won the election in violation of Section 8(a)(1). *Id.*

The ALJ also ruled that as joint employers, Big John and Central failed to negotiate in good faith for a collective bargaining agreement with the mechanics and over the effects of the closure of the terminal. He held that these failures violated Sections 8(a)(1) and (5). The ALJ also rejected the employers' contention that the decision to close the terminal was economically motivated and forced by a Union ultimatum on benefits. *Id.* at *5–7. He found the closing was motivated by anti-union animus, and that Central's decision to reallocate work to other facilities and the effects of the closure were mandatory subjects for bargaining. *Id.* at *7. The ALJ held that the layoffs violated Section 8(a)(3) because they were retaliatory. Additionally, the ALJ found that bypassing the Union's request for effects bargaining and contacting the laid off employees directly violated Sections 8(a)(1) and (5).

The ALJ imposed a series of remedies to correct the employers' violations. For the unlawful interrogations and threats, the ALJ ordered the employers to cease and desist, and to post an appropriate notice to employees. To remedy the retaliatory terminal closing and layoffs, the ALJ ordered Central to reopen its Roanoke terminal and to reinstate (with back pay) the three laid off mechanics. To remedy Big John and Central's failure to bargain in good faith, he ordered the employers to bargain in good faith and to post a notice. ALJ op. at *9.

The Board affirmed the ALJ's rulings. It rejected Central's claim that the Union and the Board's failure to join Central in the certification proceedings barred a finding that it was required to bargain with the Union. Central contended that the ALJ's finding that it and Big John are joint employers violates due process because Central had no notice of the joint-employer allegation until the Union filed its amended unfair labor practice charge in October 1989. Other than a minor amendment to the recommended order, the Board affirmed the ALJ's order. Board op. at *1–2. Big John and Central petition this court for review of the Board's order and the Board seeks enforcement.

## II. Analysis

### Standard of Review

■ We have jurisdiction to consider the parties' petitions under 29 U.S.C. §§ 160(e), (f). *NLRB v. Joe B. Foods, Inc.,* 953 F.2d 287, 291 (7th Cir.1992). The Board's findings of fact are conclusive if they are supported by substantial evidence on the record considered as a whole. *Id.* (citing *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1313–14 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992)). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion." *Randall Div. of Textron, Inc. v. NLRB,* 965 F.2d 141, 144 (7th Cir.1992) (citation omitted). The Board's application of the law to particular facts is also reviewed under the substantial evidence standard. *U.S. Marine,* 944 F.2d at 1314. The Board's determinations on questions of law are upheld "unless they are irrational or inconsistent with the Act." *David R. Webb Co., Inc. v. NLRB,* 888 F.2d 501, 503 (7th Cir.1989), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990).

### A. Central's Joint Employer Status

The focus of Central and Big John's petition for review of the Board's order is the Board's determination that they are joint employers. Central argued in the administrative proceedings and maintains here that the Union and the Board were precluded from asserting a joint employer relationship by the decisions in *Alaska Roughnecks & Drillers Ass'n v. NLRB,* 555 F.2d 732 (9th Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978) and *International House v. NLRB,* 676 F.2d 906 (2d Cir.1982).

■ Certification is the "final and effective action" and the "conclusive act of decision" in the Board's determination of the parties for collective bargaining. *Inland Empire Dist. Council v. Millis,* 325 U.S. 697, 701, 65 S.Ct. 1316, 1319, 89 L.Ed. 1877 (1945). The statutory purpose of the proceedings "is to provide a hearing in which interested parties shall have full and adequate opportunity to

present their objections before the Board concludes its investigation and makes its effective determination by the order of certification." *Id.* at 708, 65 S.Ct. at 1322. The Board's certification procedures are generally binding on both employers and employees. *See, e.g.,* 29 U.S.C. §§ 158(b)(7)(A), (B). Moreover, judicial review of Board findings in representation proceedings is limited; Board determinations will be reversed only if they are arbitrary and capricious. *See, e.g., S.S. Kresge Co. v. NLRB,* 416 F.2d 1225, 1229 (6th Cir.1969) · (citing 29 U.S.C. § 159(b)). *See also NLRB v. 1199, Nat'l Union of Hospital & Health Care Employees,* 824 F.2d 318, 322 (4th Cir.1987) (party challenging Board's certification bears "heavy burden"). This court has not considered the consequences of Board certification proceedings in subsequent evaluations of employer status. The Ninth Circuit, however, has ruled that the certification is determinative of employer status. *Alaska Roughnecks & Drillers Ass'n v. NLRB,* 555 F.2d 732 (9th Cir.1977). *Accord Goodyear Tire & Rubber Co. v. NLRB,* Nos. 16–CA–14820, 16–CA–14838, et al., 1993 NLRB LEXIS 160 (Feb. 10 1993) (employer not included in certification proceedings could not be deemed joint employer liable for failure to bargain).

Like this case, *Alaska Roughnecks* involved leased employees and the lessee's refusal to bargain with a union representing the leased employees. Mobil Oil Company operated an offshore oil drilling platform and leased employees to operate the platform from Santa Fe Drilling Company. 555 F.2d at 733. Santa Fe paid the employees' salaries, as well as their insurance and other benefits. Santa Fe was compensated, as Big John was in this case, on a cost-plus basis. Mobil supervised Santa Fe's employees and directed the drilling operations.

The Alaska Roughnecks and Drillers Association ("the Roughnecks") conducted an organization campaign aimed at all Santa Fe employees in Alaska. The Roughnecks filed two representation petitions with the Board. The petition at issue named only Santa Fe as the employer. Santa Fe received notice of and participated in the Board's certification proceedings. *Id.* at 734. The Roughnecks

stipulated at the certification hearing that Santa Fe was the employer, and the Regional Director accepted the stipulation. No claim was made that Mobil was the employer or that Santa Fe and Mobil were joint employers. *Id.* The Board certified the Roughnecks as the bargaining representative for the employees on Mobil's drilling platform. Santa Fe notified Mobil that it would require more money if collective bargaining with the Roughnecks resulted in a wage and benefit increase.

Mobil decided to solicit new bids (including one from Santa Fe) for the platform operations, anticipating that collective bargaining would increase its labor costs with Santa Fe. Another company's bid was lower than Santa Fe's, and Mobil notified Santa Fe that it was cancelling their contract. It contracted with the competitor. 555 F.2d at 734. Meanwhile, negotiations between Santa Fe and the Roughnecks broke down, and after Santa Fe informed the Roughnecks of Mobil's termination, the Roughnecks for the first time requested that Mobil bargain as a successor employer. *Id.* Mobil refused to bargain, and the Roughnecks filed an unfair labor practice charge with the Board alleging that Mobil was a successor employer. The Board eventually issued a complaint charging Mobil, as a joint employer with Santa Fe, with violations of Sections 8(a)(1) and (5) of the Act. *Id.* at 734. The Board determined that Mobil violated the Act.

Mobil petitioned the Ninth Circuit for review. The court noted that there was no evidence that Mobil was guilty of anti-union bias, and that the basis of the Board's ruling was its determination that Mobil was a joint employer. Mobil contended that it could not be required to bargain with the Roughnecks because: (1) it had not received an opportunity to participate in the certification proceeding, (2) it had not received notice or an opportunity to challenge the joint employer finding, and (3) because the Roughnecks had not requested bargaining with Mobil until after it terminated its contract with Santa Fe. *Id.* at 735. The Ninth Circuit agreed.

Resting its decision on due process considerations, the court held that because Mobil was not given notice and a timely opportuni-

ty to challenge the Board's determination that it was a joint employer, Mobil was not obligated to bargain with the Roughnecks. *Alaska Roughnecks*, 555 F.2d at 735. The court found it significant that Mobil was not informed that it was considered an employer until the Roughnecks asked it to bargain after the Santa Fe contract was canceled; it was not informed it was considered a joint employer until the Board issued its complaint. The court ruled the notice was untimely because it came after the termination of the contract. Further, the court held that even if Mobil "could have anticipated its duty to bargain, ... the Act imposes no such duty." *Id.* Board regulations governing certification proceedings provide that the certification *shall* contain the employer's name, and that the employer *shall* be notified. *Id.* (citing 29 C.F.R. §§ 102.61(e), 102.-63). Mobil knew of the Board's certification proceedings, and that it was not asked to participate. The court found that even though Mobil may have been aware of the Roughnecks' activities before the Roughnecks requested bargaining, Mobil was entitled to rely on the certification result that Santa Fe was the employer, not Santa Fe *and* Mobil.

■ We find the Ninth Circuit's reasoning persuasive, and adopt its sound approach. We believe, however, that it is the Act, not the Constitution, which requires that the Board be bound by its determinations in certification proceedings. The regulations that require the identification of the employer in the certification petition are mandatory. *See* 29 C.F.R. §§ 102.61(e), 102.63. Moreover, as the Ninth Circuit noted, petitions for certification may be amended to include joint employers. *Alaska Roughnecks*, 555 F.2d at 736. Courts accord considerable deference to the Board's certification decisions. *S.S. Kresge Co. v. NLRB*, 416 F.2d 1225, 1229 (6th Cir.1969) (citing 29 U.S.C. § 159(b)). This deference imposes upon the Board a duty to consider certifications carefully. Further, because a Certification of Representation binds the parties, it seems proper that it also bind the Board.

In this case, as in *Alaska Roughnecks*, the Union was aware of the relationships be-

tween Central and Big John when it commenced the representation proceedings. Big John was the only employer notified of the proceedings by the Board, and only Anger (its President) participated. Anger signed off as the employer on all of the Board's documentation. The Union did not allege that Central was a joint employer until after the terminal was closed, the employees were laid off, and the first unfair labor practice charge was levied. We agree with the Ninth Circuit that this notice simply came to late to permit the Board to impose a duty to bargain upon Central.

We are not persuaded by the Board's arguments that a stipulation entered into by the parties in the administrative proceeding, and the union's presentation of authorization cards to Central manager Ray Carr prior to the certification proceedings, justify a finding that Central is a joint employer. Board op. at *1. Central stipulated that the facts surrounding the operation of the Roanoke terminal support a finding that Central and Big John were joint employers of the mechanics, but expressly preserved its argument that the Union and the Board were precluded from asserting the relationship under *Alaska Roughnecks*. Therefore, the factual stipulation has no significance for our evaluation of the impact of the certification proceedings.

The Board also argues, relying in part upon *Alaska Roughnecks*, that the letter Hinton sent to Ray Carr at Big John—which informed him that a majority of the mechanics signed union authorization cards and demanded recognition—was sufficient to notify Central that it was deemed a joint employer with bargaining responsibilities. We disagree. First, the letter identified Carr as a Big John employee. *See* Hinton Letter of 4/18/89, Government Exhibit (G. Ex.) 7 to Administrative Hearing ("Mr. Ray Carr, Big John, Inc."). Although this letter might make Central aware of the Union's organizing activities, it would not notify Central that it was deemed a relevant employer. Indeed, it would have the opposite effect because Carr was identified as a Big John employee. In *Alaska Roughnecks*, the court found that Mobil's awareness of the union's organizing activity did not constitute adequate notice of

its joint-employer status when the union did not demand recognition until after certification and the termination of the Santa Fe contract. 555 F.2d at 736.

The facts presented here are similar. First, the Union did not inform Central that it deemed Central a joint employer until after the contract with Big John was canceled and it filed charges with the Board. Second, although *Alaska Roughnecks* considered *Ace–Alkire Freight Lines, Inc. v. NLRB*, 431 F.2d 280, 282 (8th Cir.1970), in which the employer was notified of the union's representation through the presentation of signed authorization cards, it did not rule that presentation of the cards constitutes sufficient notice when the employer is not named in a subsequent certification proceeding. *See* 555 F.2d at 736–37. In *Ace–Alkire*, the court noted, there was no representation proceeding, but the presentation of the signed cards provided notice to the employers of their duty to bargain because both employers were presented with the cards. *Alaska Roughnecks*, 555 F.2d at 737 (discussing *Ace–Alkire*, 431 F.2d at 282.) The court did state that if Mobil had been presented with authorization cards, *Ace–Alkire* "might be relevant." *Alaska Roughnecks*, 555 F.2d at 737.

In this case, however, we find that because (1) Hinton requested recognition but addressed Carr as an employee of Big John, and (2) the subsequent formal representation proceedings did not include Central, any notice of joint employer status that Hinton's letter might have provided was abrogated. We also reject the Board's position that because Anger kept Central apprised of the Union's demands in negotiations, Central intervened in the negotiations. In *Alaska Roughnecks*, Santa Fe notified Mobil that its labor costs might increase as a result of collective bargaining, and Mobil found another source of employees. 555 F.2d at 734. The court refused to hold that this awareness was sufficient to render Mobil a joint employer. We agree with the Ninth Circuit that

knowledge of the status of ongoing negotiations does not override the failure to name an employer in the Certification of Representation.[2]

Finally, the Board's citation of *American Air Filter Co.*, 258 NLRB 49 (1981), and *U.S. Pipe & Foundry Co.*, 247 NLRB 139 (1980) to support its position is unpersuasive. In *American Air*, the Board considered the consequences of certification proceedings for bargaining responsibilities. It purported to distinguish *Alaska Roughnecks*, but ruled that "[e]ven were there no distinctions between these cases ... I [ (the Board adopted the ALJ's opinion in its entirety) ] would not regard *Alaska Roughnecks Assoc.* as controlling here for I am bound by the Board's construction of the Act even though it may be at variance with the views of the court of appeals." 258 NLRB at 53 n. 6. The opinion cites Board decisions for this proposition, including one in which its ruling was reversed by the District of Columbia Circuit, and the reversal was affirmed by the Supreme Court. *See Insurance Agents' Int'l Union, AFL–CIO*, 119 NLRB 768 (1957), *rev'd*, 260 F.2d 736 (D.C.Cir.1958), *aff'd*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). The NLRB's assertion that it is not obligated to acquiesce in a court of appeals decision is not novel, *see* Note, *Administrative Agency Intracircuit Nonacquiescence*, 85 Colum.L.Rev. 582, 587–88 (1985), but it hardly convinces us that the Ninth Circuit is incorrect. In *American Air*, the Board refused to accord weight to the certification proceedings because they "are intended principally to determine the interests of employees...." 258 NLRB at 52. We believe the proceedings affect important employer interests as well, and for that reason the certification should be binding on all parties: Board, union, employee, and employer. We find the Board's contrary position inconsistent with the Act and implementing regulations.

The other case upon which the Board relies in its opinion below is also unavailing.

---

**2.** An employer who fails to raise its objection to a Board pronouncement that it is a joint employer in a timely manner can waive that objection. *See NLRB v. Western Temporary Services, Inc.*, 821 F.2d 1258, 1264 (7th Cir.1987) (waiver when employer waited approximately 15 months after receiving notice that Board considered it a joint employer to raise objection). There has been no allegation that Central's objection was untimely.

In *U.S. Pipe & Foundry*, 247 NLRB 139 (1980), U.S. Pipe leased truck drivers, and when charged with an unfair labor practice, argued that it was not a joint employer. The Board disagreed. The union had filed an election petition some years before the dispute, asserting that the leasing company and U.S. Pipe were joint employers. The Board dismissed the election and certification proceedings. It declined to consider the joint employer issue because "of the continued recognition of the union which was certified by the Board as the representative of a unit which includes the employees involved herein." *U.S. Pipe & Foundry Co.*, 223 NLRB 1443, 1444 (1976). Because of the very different factual context presented in *U.S. Pipe*, we do not find its holding helpful here. Accordingly, we vacate that portion of the Board's order sanctioning Central for failing to bargain with the Union.

### B. Big John's Refusal to Bargain

Big John does not raise separate objections to the Board's finding that it unlawfully refused to bargain with the Union. Instead, both employers raise joint arguments and contend that the Board's holding was "clear error" because there was no refusal to bargain. Because Central had no duty to bargain, we will consider these joint arguments only as they pertain to Big John.

Under Section 8(a)(5) of the Act, it is an unfair labor practice for an employer to refuse to bargain with employees. 29 U.S.C. § 158(a)(5); *see NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 821 (7th Cir.1991). Good faith bargaining is a mutual obligation of employers and employees. 29 U.S.C. § 158(d); *NLRB v. Insurance Agents Int'l Union*, 361 U.S. 477, 488, 80 S.Ct. 419, 426, 4 L.Ed.2d 454 (1960). An employer is obligated to negotiate with the certified representative of its employees over the effects of a closure of all or a part of its business. *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 676–77 n. 15, 681, 101 S.Ct. 2573, 2580 n. 15, 2582, 69 L.Ed.2d 318 (1981); *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1286 (7th Cir.1989).

Big John contends that the Union refused to bargain, and failed to properly request bargaining, so its failure to bargain cannot be unlawful. It asserts that Hinton's position on employee benefits was inflexible, and that his demand illustrates that the Union's bargaining with Big John was not in good faith. After Anger informed Hinton that Central would close the Roanoke terminal due to economic necessity, Anger and Hinton discussed the situation on the phone. Big John argues that Hinton's failure to demand a face-to-face bargaining session at that time illustrates that the Union never requested bargaining over the closure, and effectively waived the right to bargain. The waiver is further evidenced by the Union's attempt to arrange a bargaining meeting through written correspondence rather than over the telephone. Petitioners' Brief at 39. If the Union really wanted to bargain, Big John argues, Hinton would have telephoned, not written letters. Moreover, the "communications from the Union did not convey a tone of urgency or notify Big John of the existence of an immediate concern on behalf of any unit members." *Id.* at 40. Therefore, Big John argues, its direct contacts with employees about other available positions and its failure to respond to Anger's written requests for bargaining were justified.

The ALJ saw the events a little differently, and we believe his conclusions are supported by substantial evidence in the record. An employer has a duty to bargain over the effects of a closure

> in a meaningful manner and at a meaningful time. The closure cannot be a "fait accompli" which would make good-faith bargaining "futile or impossible." The determination of whether an employer has provided such meaningful and timely notice is essentially one of fact, and the Board's findings in this regard are to be accepted if supported by substantial evidence.

*Emsing's Supermarket*, 872 F.2d at 1286–87. The ALJ found that Hinton informed Anger at the first negotiating session that all the elements of the collective bargaining agreement were negotiable. ALJ op. at *3 n. 5. He also found that Toca's letter and Anger's communication with Hinton were not invita-

tions to bargain, but announcements of a "*fait accompli.*" ALJ op. at *6. The ALJ found that the employers rejected the Union's first proposal, closed the terminal on September 1, and laid off the mechanics. On September 8, 1989, Hinton wrote to Anger requesting effects bargaining and proposing three dates in September, or any date in October. G. Ex. 13. Anger did not respond to the letter until October 5, when he informed Hinton he would be unavailable until after October 18. G. Ex. 14. On October 19, Hinton wrote back to Anger acknowledging Anger's letter and informing him of his availability for bargaining at any time during the remainder of October and until November 21. G. Ex. 15.

■ Given the tone of Toca's letter (quoted *supra* at 4), Hinton's persistent requests for bargaining, and the timing of Big John's contacts with the laid-off mechanics, we believe the ALJ's determination that Big John refused to bargain in good faith is amply supported by the record. This is the sort of evaluation "that Congress committed to the expertise of the Board and that generally deserves our deference." *Emsing's Supermarket*, 872 F.2d at 1287 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951) (the Board is equipped or informed by experience to deal with this specialized field)). Although a union may waive its right to bargain, *G. Heileman Brewing Co. v. NLRB*, 879 F.2d 1526, 1532 (7th Cir.1989), an employer must make a clear and unmistakable showing of waiver. *Id.* Big John has wholly failed to make this showing. Indeed, Big John did not respond to Hinton's requests to bargain, and bypassed the Union to contact the laid off employees directly, first on October 26 and then in February 1990, to offer them alternative employment. Accordingly, we enforce the Board's order as it pertains to Big John's failure to bargain.

## C. Non–Bargaining Violations of the Act

We also find that the remainder of the Board's findings are correct, and the corresponding sections of its order should be enforced. Central's lack of formal status as a joint employer does not excuse the threats to, and interrogations of its employees, nor the retaliatory layoffs and closing of the Roanoke terminal. The NLRA prohibits any employer (whose activities affect interstate commerce) from interfering with, coercing, or in any way restraining employees from exercising their rights to organize and select bargaining representatives, regardless of whether the employees are represented by a union. 29 U.S.C. § 157. Indeed, the Act is designed in part to protect employees from these actions when they are attempting to select a bargaining representative.

■ Threatening employees with shop closure or discharge, or coercively interrogating them to discourage union activities violates Section 8(a)(1) of the Act. 29 U.S.C. § 158(a)(1). Any conduct which interferes with, restrains, or coerces employees in the exercise of their rights to form, join, or assist labor organizations is prohibited. *Id.* Section 8(a)(3) prohibits business closings motivated by anti-union animus. *See First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 682, 101 S.Ct. 2573, 2582, 69 L.Ed.2d 318 (1981) ("An employer may not simply shut down part of its business and mask its desire to weaken and circumvent the union by labeling its decision 'purely economic.'").

### 1. Interrogations

■ Carr admitted at the administrative hearing that he asked employees if they signed authorization cards, and Central does not contest that Bowen questioned Melton about the election. ALJ op. at *4, *5. To determine whether questioning about union activities violates the Act, we ask "whether under all the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Sunnyvale Medical Clinic*, 277 NLRB 1217, 1217 (1985). *See also Midwest Stock Exchange v. NLRB*, 635 F.2d 1255, 1267 (7th Cir.1980). Factors we consider include the background of the relationship, the nature of the information sought, the identity of the questioner, and the place and method of the interrogation. *Id.* at 1281. The ALJ found that the employees' reports of past anti-union remarks by Central's management were credible and evinced a history of anti-union

bias. The employers concede the questions were asked. Carr was the employees' supervisor, and no employees were open supporters of the Union. The employees all denied to Carr that they supported the Union, which tends to show that Carr's mode of questioning was not merely social or incidental. Given these factors, we believe the ALJ's determination that the interrogations violated the Act is supported by substantial evidence, and we enforce the Board's order enjoining future interrogations.

### 2. Threats

The ALJ found, and the Board affirmed, that the employees were threatened with terminal closure if the union was elected, another violation of § 8(a)(1). The employers raise three challenges to the ALJ's determination. They assert that Carr's testimony was more credible than the mechanics' testimony, that his statements were not threats because they merely expressed Carr's opinions, and that the statements could not be attributed to them because Carr did not have authority to close the terminal.

Carr admitted that he told mechanic Berger that the terminal would probably close because of the Union's election in 1989. The ALJ found that Carr also told the mechanics when they were hired in 1987 that union representation would result in the terminal's closure. The 1987 remarks fall outside the Act's six-month period of limitations. See 29 U.S.C. § 160(b). Nevertheless, the ALJ properly considered the remarks as evidence of anti-union bias. The ALJ also found that before the election, Carr told mechanic Bell that the terminal might "possibly" close if the Union won.

Central contests these findings, primarily arguing that Carr was a more credible witness than the mechanics who testified. But we will not overturn an ALJ's credibility determinations absent extraordinary circumstances. These include a clear showing of bias by the ALJ, utter disregard for uncontroverted sworn testimony, or acceptance of testimony which on its face is incredible. NLRB v. Advance Transp. Co., 979 F.2d 569, 573 (7th Cir.1992); NLRB v. So–White Freight Lines, Inc., 969 F.2d 401, 407 (7th Cir.1992). Central has failed to establish any of these circumstances. Indeed, Carr admitted that he told mechanics Bell and Berger during the statutory period that the terminal might close if the Union was elected. Petitioners' Brief at 21. Carr denies the threats to the mechanics when they were hired in 1987, and asserts that the ALJ's failure to credit the denial requires reversal. But again, this is a determination for the ALJ, and the employers have failed to carry the high burden borne by parties challenging an ALJ's credibility determinations. The ALJ did not reject uncontroverted testimony or credit inherently unbelievable testimony; we decline disturb his finding that Carr made the 1987 threats.

The employers also challenge the determination that Carr's comments to Bell in 1989 were threats because they were merely a "man-to-man confidence." Id. at 23. They contend that because these statements were merely statements of opinion based on Carr's "gut feeling," they cannot be threats. Id. at 23–24. But predictions of the economic consequences of union activity must be "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at...." Wiljef Transp., Inc. v. NLRB, 946 F.2d 1308, 1311 (7th Cir.1991) (quoting NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969)). Otherwise, the comments are threats violative of § 8(a)(1) of the Act. The requirement of an objective basis applies to expressions of both economic consequences and management decisions. Wiljef, 946 F.2d at 1311.

Finally, the employers argue that Carr's threats cannot be imputed to them because Carr had no control over the decision to close the terminal. Because the employees knew Carr was not in a position to authorize the closure of the terminal, the mechanics could not have construed his opinions as threats. This assertion is nonsense. We have held that supervisors' threats violate the Act, just as effectively as threats from the CEO. See Northern Wire Corp. v. NLRB, 887 F.2d 1313, 1316 (7th Cir.1989) (supervisors told

employees owner would "lock up the place" and "close the doors" if union was elected). Carr, as the mechanics' supervisor, served as their liaison with their employers. The mechanics could quite reasonably have considered his opinions those of the employers. Further, Central's argument that Carr's comments cannot be threats because the employees knew Carr lacked authority to close the terminal misses the point. Threats of plant closure violate § 8(a)(1) "because these acts reasonably tend to coerce employees in the exercise of their rights, regardless of whether they do, in fact, coerce." *Northern Wire*, 887 F.2d at 1317. Therefore, whether the employees were actually coerced by the threats is irrelevant. The ALJ's interpretation of Carr's statements finds more than adequate support in the record, and we enforce the Board's order enjoining future threats.

### 3. Retaliatory Layoffs

■■■■ An employer may not discharge an employee because of union activity. 29 U.S.C. § 158(a)(3); *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 394, 103 S.Ct. 2469, 2470, 76 L.Ed.2d 667 (1983). In order to sustain a charge, the General Counsel must show only that a layoff is in any way motivated by a desire to frustrate union activity. *Id.* at 399, 103 S.Ct. at 2473. The employer may escape liability if it can show that it would have taken the same action for wholly permissible reasons. *Id.* (interpreting and approving *Wright Line*, 251 NLRB 1083 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)); *Sonicraft, Inc. v. NLRB*, 905 F.2d 146, 150 (7th Cir.1990), cert. denied, 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991). Motive "is a critical factor to be determined as a question of fact." *Northern Wire*, 887 F.2d at 1318 (citations omitted). "Direct and uncontroverted evidence of anti-union animus is not required to uphold such a finding." *NLRB v. So-White Freight Lines, Inc.*, 969 F.2d 401, 408 (7th Cir.1992) (citing *NLRB v. Bliss & Laughlin Steel Co.*, 754 F.2d 229, 235 (7th Cir.1985)). The Board may consider the timing of the adverse action as evidence of motive. *Northern Wire*, 887 F.2d at 1318 (cit-

ing *NLRB v. Jakel Motors, Inc.*, 875 F.2d 644, 646 (7th Cir.1989)). Further, comments by company officials which demonstrate " 'manifest hostility' toward union activity are relevant to determining discriminatory motive." *Id.* at 1318-19.

■■■■ Central argues that it decided to close the terminal because the Union's inflexible bargaining position "was simply unacceptable to Central." Petitioners' Brief at 27. It further contends that the ALJ's acceptance of Union Representative Hinton's version of the Union's bargaining position was clearly erroneous. *Id.* But, as we have noted, credibility determinations are left to the ALJ absent extraordinary consequences. Both parties presented versions of the course of bargaining, and Hinton's version was not inherently incredible. *See Advance Transp. Co.*, 979 F.2d at 573. Despite the employers' challenges to the ALJ's finding that the layoffs and terminal closing were the result of anti-union bias, we believe the finding is well supported.

Statements by Carr and other Central managers reflected a history of anti-union bias. Further, the layoffs and terminal closure occurred within a month and a half of the Union's certification and the commencement of bargaining. Only employees who voted for the union were laid off. The ALJ found that the terminal's work was simply transferred elsewhere, and that the mechanics were busy until the closing. ALJ op. at *5. The closing fulfilled Carr's prediction of the consequences of unionization. We believe these facts are sufficient to support the ALJ's conclusion that the mechanics' union activities motivated the closure and layoffs in violation of the Act.

### Conclusion

For the foregoing reasons, the Board's cross-petition for enforcement of its order to remedy Big John's and Central's violations of the Act is granted, except for those portions which pertain to Central's refusal to bargain. We vacate that portion of the order which requires Central to bargain with the Union. *See* Order, §§ 1(d), 2(d), ALJ op. at *9, *10. We also strike the portion of the Notice to

Employees affirming Central's duty to bargain. *See* Notice to Employees, Board op. at *2. Of course, if the Union becomes certified as the representative of Central's employees, Central is obligated by the Act to bargain in good faith. The remainder of the relief afforded by the Board's order is appropriate.

Petition for Review Granted in Part; Denied in Part.

Cross–Application for Enforcement Granted in Part; Denied in Part.