**KMART CORPORATION d/b/a Super Kmart Center (Bradley and Broadview, Illinois), Petitioner and Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent and Cross-Petitioner,**

and

**Local 546, United Food and Commercial Workers Union, AFL–CIO, Intervenor.**

Nos. 97–3587, 97–4090, 97–4167 and 98–1140.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1998.

Decided March 31, 1999.

Jeffrey C. Kauffman, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for K–Mart Corp. in Nos. 97–3587, 97–4167, 98–1140.

John D. Burgoyne, David Habenstreit, Rachel Gartner (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC; Glenn A. Zipp, National Labor Relations Board, Region 33, Peoria, IL, for N.L.R.B. in No. 97–4090.

Douglas A. Darch (argued), Jeffrey C. Kauffman, David S. Baffa, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Niels Hansen, Kmart Corporation, Troy, MI, for K–Mart Corp. in No. 97–4090.

Rachel Gartner (argued), John D. Burgoyne, National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC; Stephen S. Shostrom, National Labor Relations Board, Region 33, Peoria, IL, for N.L.R.B. in Nos. 97–3587.

Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL, John D. Burgoyne, National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for N.L.R.B. in No. 97–4167.

Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL; John D. Burgoyne, David Habenstreit, Rachel

Gartner, National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for N.L.R.B. in No. 98-1140.

Before COFFEY, ROVNER and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

In two separate proceedings, the respondent National Labor Relations Board ("NLRB" or "Board") found that the petitioner Kmart Corporation ("Kmart") violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 151, *et seq.*, by refusing to bargain with two unions that were certified as the collective-bargaining representatives of appropriate units of Kmart's meat department employees at two Super Kmart Center stores in Bradley and Broadview, Illinois, following NLRB-conducted elections. On appeal, Kmart does not dispute that it refused to bargain with the certified and elected union representatives, but rather contests the NLRB's findings that the meat department employees at the two stores constituted appropriate bargaining units. We affirm.

## I. BACKGROUND

Kmart owns and operates Super Kmart Centers throughout the United States. Much larger than a traditional Kmart store, Super Kmart Centers are vast, one-stop shopping centers open twenty-four hours per day, seven days per week. Each Super Kmart Center is organized into four divisions: (1) customer service, which includes cashiers, cash and general offices, and invoicing; (2) hardlines, which include items such as electrical appliances, toys, camera equipment, garden equipment, and sporting and automotive equipment; (3) softlines, which include items such as clothing, accessories, and jewelry; and (4) food, which includes items such as grocery, dairy, meat, produce, bakery, deli, health and beauty, as well as pet products and a food court. The food sections comprise approximately one-third of the total selling space in the store.

Kmart owns and operates two such stores in Bradley and Broadview, Illinois. Both of these stores include food divisions which consist of meat, deli, produce, and bakery departments. The Bradley meat department unit consists of some twenty-three people, including six meat cutters and a total of thirteen meat wrappers and perishable service associates ("PSAs"), while the meat department unit at the Broadview store employs fourteen individuals, including four meat cutters and a total of eight meat wrappers and PSAs. The meat departments in both stores handle three varieties of meat products, including prepackaged products requiring no processing whatsoever, boxed fresh meat, and ground beef.

Meat cutters' responsibilities include preparing pre-mixed ground beef for sale by running it through a patty machine which forms the beef into patties as well as preparing boxed meat by partitioning large pieces of meat enclosed in shipping boxes, known as "primals," into either "sub-primal" cuts, steaks, or roasts through repetitive slicing and trimming tasks. According to the record, the meat cutters use the following specialized meat cutting skills in preparing the primals: (1) they "angle" meat, or slice the pieces so as to make them more regularly shaped and reduce fatty waste; (2) they "face" the meat, or create a smooth edge on both sides; (3) they "chime" the meat, or flatten the bones with a saw to remove sharp edges; and (4) they "seam" the meat, or cut the sinewy membranes between the portions of beef and remove glands from the cuts.

The employees classified as meat cutters receive wages of approximately $17.50 per hour, more than three times as high as other employees in the Bradley and Broadview stores. Meat wrappers operate wrapping machines and package and price the meat after it has been cut by the meat cutters. The meat wrappers earn wages

slightly higher than the $5.50 per hour starting wage paid to meat department PSAs. The PSAs are responsible for continually stocking fresh and frozen meat counters, staffing the gourmet and seafood counters, and preparing products such as meatloaf and shish kabob, and their wages are equal to that of other employees in the store.

On October 10, 1996, Local 546 of the United Food and Commercial Workers Union ("Local 546") filed a petition with the NLRB's regional office, seeking certification as the exclusive bargaining representative of the meat department's employees at the Broadview store, while on December 16, 1996, Local 1540 of the United Food and Commercial Workers Union ("Local 1540") filed a petition with the NLRB's regional office seeking certification as the exclusive bargaining representative of all of the meat department employees at the Bradley store. The regional director for the two geographic regions ruled that the employee units petitioned for were appropriate. The director ruled specifically that those employees assigned to the two respective meat departments shared a "community of interests" separate from other employees at the two Super Kmart Centers and that there was minimal interchange between meat department employees and non-meat department employees. Furthermore, the director found that the meat department employees utilized special skills, had separate daily supervision, and worked in physically separate areas. The director ordered that representation elections be conducted among and limited to the meat department employees for both stores to determine whether they wished to be represented by the locals.

Following successful votes for unionization in the respective meat departments, the NLRB certified Local 1540 as representative of the meat department employees at the Bradley store on May 22, 1997, and Local 546 as representative of the meat department employees at the Broad-

view store on August 4, 1997. After Kmart refused to recognize Local 1540 and Local 546 in the respective stores, each filed charges with the NLRB alleging that the refusals constituted unfair labor practices under the National Labor Relations Act. The general counsel of the NLRB issued an unfair labor practice complaint alleging that Kmart had violated 29 U.S.C. § 158(a)(5) and (1) of the National Labor Relations Act which requires that "[i]t shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees ..." and "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed [in the National Labor Relations Act]." The director's general counsel filed motions for summary judgment with the NLRB, and Kmart filed answers contesting the validity of the underlying certifications.

On September 11, 1997, and December 9, 1997, the NLRB issued decisions and orders granting the motions for summary judgment in the Bradley and Broadview cases respectively. In both cases, the NLRB found that the issues raised by Kmart before the NLRB could have been litigated in the prior representation proceedings and that the company did not offer to adduce any newly discovered or previously unavailable evidence at the NLRB hearing. Furthermore, Kmart failed to argue any special circumstances that required the NLRB to reexamine its earlier unit determinations. Accordingly, the NLRB found that Kmart violated 29 U.S.C. § 158(a)(5) and (1) by refusing to bargain with the respective locals. The NLRB ordered the company to bargain with the locals upon request.

## II. ISSUE

On appeal, we consider whether the NLRB reasonably determined that units consisting of meat department employees in two Kmart stores constituted appropriate bargaining units and therefore properly found that Kmart violated sections

8(a)(5) and (1) of the National Labor Relations Act by refusing to bargain with the duly certified collective bargaining representatives of those employees.

## III. DISCUSSION

In reviewing the matter under consideration, we will sustain the Board's factual findings if the record as a whole provides substantial evidence to support them, even if we might justifiably have reached a different conclusion as a matter of first impression. 29 U.S.C. § 160(e); see NLRB v. Winnebago Television Corp., 75 F.3d 1208, 1212 (7th Cir.1996). "[W]e defer to reasonable NLRB conclusions in analyzing its application of the law to particular facts, in recognition of the Board's special function of applying the general provisions of the Act to the complexities of industrial life." NLRB v. Champion Labs., Inc., 99 F.3d 223, 227 (7th Cir.1996) (citation and internal quotation omitted). Similarly, we review the Board's statutory interpretations deferentially, because the National Labor Relations Act is a statute the Board is entrusted with enforcing. See NLRB v. Joe B. Foods, Inc., 953 F.2d 287, 291–92 (7th Cir.1992). This Court recognizes that "the selection of an appropriate bargaining unit lies largely within the discretion of the Board, whose decision, 'if not final, is rarely to be disturbed....' " Prairie Constr. Co. v. Local 627, Int'l Union of Operating Eng'rs., 425 U.S. 800, 805, 96 S.Ct. 1842, 1844–45, 48 L.Ed.2d 382 (1976) (quoting Packard Motor Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947)). Accordingly, this Court recognizes that the Board's unit determinations should not be reversed unless they are arbitrary or unreasonable. See NLRB v. Gogin, 575 F.2d 596, 603 (7th Cir.1978). To disqualify a unit, the employer must establish "not that another unit is more appropriate, but that the unit selected is utterly inappropriate." Arcadian Shores, Inc. v. NLRB, 580 F.2d 118, 120 (4th Cir.1978). Furthermore, the Court may not substitute its judgment for a rationally supported position adopted by the NLRB, see Ralph Rogers & Co. v. NLRB, 870 F.2d 379, 382–83 (7th Cir. 1989), and underlying factual findings must be upheld if they are supported by substantial evidence. 29 U.S.C. § 160(e).

In determining that Kmart's meat department employees in the Bradley and Broadview stores constitute appropriate bargaining units, the NLRB considered the appropriateness of meat department units generally. The record provides that in the past, meat departments were made up almost exclusively of meat cutters. The NLRB previously found that meat department units were presumptively appropriate because meat cutters exercised a broad range of traditional meat cutting skills. See R–N Market, Inc., 190 NLRB 292 (1971); Big Y Foods, Inc., 238 NLRB 855 (1978). Specifically, meat cutters exercised specialized butchering skills in cutting "carcass meat." See Big Y Supermarkets, 161 NLRB 1263, 1268 (1966). It was not unusual to certify a meat department unit, for "[i]t is well established that a meat department unit is presumptively appropriate, in the absence of any contrary bargaining history." Id. According to the record, as the retail meat industry evolved in the 1980's, fewer meat departments in retail settings handled carcass meat; more handled "boxed meat," which arrived at the meat department in shipping boxes and was already broken down into subprimal (smaller) pieces. Though subprimal meats required additional cutting in preparation for retail sale, fewer workers in retail meat establishments exercised the full range of traditional meat cutting skills in handling subprimals. Thus, the NLRB found that the skill level of evolving meat department employees did not warrant applying the presumption that a unit limited to meat department employees was appropriate. See Ashcraft's Market, Inc., 246 NLRB 471, 472 (1979); Hall's Super Duper, 281 NLRB 1116, 1117 (1986). In reaching this conclusion, however, the NLRB did not adopt a presumption that meat departments were inappropriate

units under any circumstance, rather the NLRB ruled that, in meat departments handling primarily boxed meat, as opposed to carcass meat, it would apply a traditional "community of interest" analysis to determine the appropriateness of a separate meat department unit. *See Copps Food Center, Inc.*, 301 NLRB 398, 399 (1991). Thus, in the case of *Hall's Super Duper*, 281 NLRB at 1117, the NLRB found a unit limited to meat department employees to be inappropriate where the meat cutters primarily handled boxed and case-ready meats and the employees in the meat department had a strong community of interest with other employees in the store, including, but not limited to, similar wages, benefits, common facilities, and regular contact with other store employees. We are well aware that these findings were made despite the fact that the meat department was separately supervised and there was little interchange between the meat department employees and other store employees.

 Very recently, in the case of *Scolari's Warehouse Markets, Inc.*, 319 NLRB 153 (1995), the Board refined its analysis of the appropriateness of meat department units. In *Scolari*'s, the NLRB concluded that its prior approach in *Hall's Super Duper* and *Ashcraft's Market* was overly restrictive and that it is "incumbent upon the Board to consider the actual work performed by the meatcutters in order to determine whether they continue to exercise substantial, traditional meatcutter skills." *Id.* at 156–57. The Board concluded that in its prior decision, it had employed an unexpressed and unfounded presumption that meat cutters who handled boxed meat necessarily lacked sufficient skills to warrant separate representation. *Id.* at 156. The NLRB stated:

> The use of boxed meat was not distinguished from the use of case-ready meat, but rather was contrasted with the use of sides of beef requiring the exercise of full journey-level skills. Thus, the Board in *Hall's*, noting that three-

quarters of the meat was prepackaged and a quarter was boxed meat, stated the meatcutters did not exercise traditional butchering skills but merely cut the delivered meats into smaller portions and trimmed the fat prior to the wrapper's weighing and measuring the meat. The Board did not analyze the skills necessary to handle the employer's boxed meat and, as indicated, made no distinction between processing boxed and case-ready meat. Similarly, in *Copps*, the Board failed to detail the meatcutting skills necessary to handle the employer's boxed meat....

*Id.* at 156–57. Thereafter, the Board, in applying the traditional "community of interest" analysis, found that the meat department in question constituted an appropriate separate unit:

> In sum, we found that the following factors: (a) the substantial portion of the Employer's meat department business involving boxed meat; (b) the continued application of specialized meatcutting skills necessary for the processing of boxed meat; (c) the higher level of training of meatcutters; (d) the substantial percentage of the unit engaged in skilled meatcutting work; (e) separate supervision; (f) limited interchange and transfers; and (g) higher wages, outweigh the factors of common benefits and limited skills necessary for handling the Employer's case-ready meats, and support a finding that the meat department employees have a distinct community-of-interest apart from that of the Employer's other employees.

*Id.* at 158. Thus, it is clear from the *Scolari*'s decision that although meat department employees need not exercise a full range of traditional meat cutting craft skills to constitute an appropriate separate unit, they must perform separate and distinct skills and functions from other employees in preparing meat for final retail sale. The appropriateness of a meat department unit depends upon balancing the

degree of the distinct functions and skills of the meat department employees with the other community of interest factors traditionally considered by the Board to determine, if on balance, the meat department's community of interest lies within the department or with other employees in the store.

Relying upon the standards set forth in *Scolari's*, we consider whether the Board correctly concluded that separate units are appropriate in the case under consideration. Initially, we determine whether the meat cutters exercise specialized skills. Similar to the circumstance in *Scolari's*, where fifty to fifty-five percent of the meat sold was boxed meat which required processing by meat cutters and meat wrappers, forty-eight percent of the Bradley store's and forty percent of the Broadview store's meat sales are cuts processed from boxed meat. Furthermore, as in *Scolari's*, meat cutters in both stores spend the vast majority of their time cutting primals and subprimals into retail cuts, a task which requires them to use discretion and a range of meat cutting skills in order to maximize the retail value of the meat to Kmart. As discussed earlier, the meat cutters often employ skills such as "angling," "chiming," "facing," and "seaming" in order to prepare cuts of meat, and workers use specialty knives and saws to cut and hew meat and bone. Moreover, as in *Scolari's*, the meat cutters in the store units work from "cut lists," which instruct them as to what sorts of meat products are needed. *Id.* at 154.

Meat cutters at the two stores also apply their specialized meat cutting skills to process boxed meat products into a salable product with a minimum of waste. All of the meat cutters at the Broadview facility were hired with experience and were questioned about their experience when interviewed for job openings. In fact, one of the meat cutters hired for the Broadview store had approximately thirty years of prior meat cutting experience. Similarly, when the initial hiring for the Bradley

facility was completed in early 1994, all the meat cutters had at least eight years of experience, as did all three meat wrappers. Furthermore, the meat cutters in both stores had a higher level of training than did other employees at the two stores.

The second *Scolari's* component requires us to consider the level of integration of the employees within the unit. Approximately twenty-five percent of the employees of the two units at issue possess traditional specialized meat cutting skills, and the remainder are meat wrappers and PSAs. Though the meat cutters are central to the operation of the department and are responsible for processing all the non-case-ready meat products that are sold, the meat wrappers and PSAs assigned to the meat department are also an integral part of the operation of the meat department. Specifically, meats prepared by the cutters usually are not ready for presentation to the retail customer when the cutters' job is complete; the meat wrappers then take over and wrap, weigh, and price the meat for display in the retail cases and the PSAs stock the cases and assist customers. Almost all meat wrappers and PSAs in the meat department are full-time employees, as opposed to other Kmart employees, of whom only twenty-three percent work full-time. Contrary to Kmart's contention that a separate meat department is inappropriate because the unit contains a majority of employees who do not perform traditional meat cutting skills, in *Great Scot of Florida*, 256 NLRB 885, n. 1 (1981), the Board ruled that the meat department unit was appropriate despite the fact that it included unskilled service clerks who were sometimes assigned to work outside the meat department. *See also NLRB v. Foodland, Inc.*, 744 F.2d 735, 738 (10th Cir.1984). In the case under consideration, all meat department employees are permanently assigned to the meat department and do not work in other areas of the store. Furthermore, courts have found meat department units to be appropriate despite the fact

that those classified as meat cutters do not constitute a majority of the unit. *See id.*

The third component of the *Scolari*'s analysis concerns supervision of the unit. The meat department employees in question have separate immediate supervision from other employees in the store. The meat department manager is a supervisor in that he has substantial authority over the day to day operation of the meat department and the employees who work in the meat department. The manager's duties extend to scheduling the hours that meat department employees work, initiating disciplinary actions, evaluating the employees' performance, and directing the work of the department. The store director has general supervision over all the employees and departments of the Kmart operation, including the meat department. But we must bear in mind that although the store director has general supervisory authority, this supervision in no way undermines the community of interest shared by the members of the meat department with their own manager and his immediate supervisory authority. The NLRB has previously held that separate immediate supervision is an important element in assessing a proposed unit's community of interest. *See Bally's Park Place, Inc.*, 255 NLRB 63, 64 (1981). In addition, the meat department manager's duties in this case are virtually identical to those of the meat department manager in *Scolari's*, 319 NLRB at 155, 158, where the NLRB found that the meat department employees' separate supervision supported the finding that they had a distinct community of interest.

The fourth component of the *Scolari's* analysis concerns the extent of employee interchange with other store departments. The evidence adduced before the Board reveals that there is little interchange between meat department employees and other departments in the two Super Kmart Centers at issue. Specifically, only three PSAs transferred into the meat department from other departments since the two stores opened, and none has transferred out. Furthermore, PSAs from other departments have been assigned on occasion to work temporarily in the meat department, and one meat department PSA worked for a total of one month in the deli department. In *Scolari's*, 319 NLRB at 155, the NLRB ruled that similarly infrequent interchanges of employees between departments did not confuse the meat department's distinct community of interest.

Finally, the fifth element of *Scolari's* concerns the relative wages of the employees in the various departments. As discussed earlier, the meat cutters receive the highest hourly wages of any employees in the store (approximately $17.50 per hour), more than three times the wage received by PSAs outside the meat department, and meat wrappers receive a higher wage than PSAs in other departments. This wage scale differential is similar to that in *Scolari's* and suggests the value that Kmart places on meat department workers' skills.

In considering the NLRB's actions in this case, we must sustain the Board's factual findings if the record as a whole provides substantial evidence to support them, even if we might justifiably have reached a different conclusion as a matter of first impression. *See Winnebago Television*, 75 F.3d at 1212. We defer "to reasonable NLRB conclusions in analyzing its application of the law to particular facts, in recognition of the Board's special function of applying the general provisions of the Act to the complexities of industrial life." *Champion Labs.*, 99 F.3d at 227 (citation and internal quotation omitted). Therefore, we are of the opinion that the NLRB, in applying the traditional community of interest factors, including skills, experience, integration, supervisory structure, employee interchange, and wage rates, reasonably determined that a separate meat department bargaining unit was appropriate.

Kmart raises several contentions in an attempt to counter the NLRB's determina-

tion. Initially, Kmart argues that this Court should reject the *Scolari*'s standard as an "arbitrary reversal of precedent." This contention is meritless, as the Supreme Court has repeatedly endorsed the notion that "[t]he responsibility to adapt the [National Labor Relations Act] to changing patterns of industrial life is entrusted to the Board." *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975). Contrary to Kmart's contention, this Court has held that "[t]he Board is free to change its mind on matters of law that are within its competence to determine, provided it gives a reasoned analysis in support of the change." *Local 1384, UAW v. NLRB*, 756 F.2d 482, 492 (7th Cir.1985).

█ Furthermore, Kmart contends that the Board's decision in this case amounts to improper "gerrymandering" of collective-bargaining units because the Board should have accorded greater weight to evidence that storewide, or "wall-to-wall," units are appropriate. The Board properly rejected this evidence because it was simply not relevant to the issue of whether the meat department units in the instant case are appropriate. The Board is not charged with determining the most appropriate unit, or required to engage in comparative analysis of the relative appropriateness of various potentially appropriate bargaining units. On the contrary, the employer must establish "not that another unit is more appropriate, but that the unit selected is utterly inappropriate," *Arcadian Shores*, 580 F.2d at 120, and Kmart has failed to do so in this case. Finally, Kmart argues that the Board determined the appropriate units on the basis of the unions' "extent of organization," in contravention of section 9(c)(5) of the National Labor Relations Act, which provides that "[i]n determining whether a unit is appropriate . . . the extent to which the employees have organized shall not be controlling." However, there is no evidence in the record to suggest that the Board even considered the unions' extent of organization. Rather, the Board closely examined the traditional community of interest factors and found, under *Scolari*'s, that separate meat department units were appropriate.

## IV. CONCLUSION

The NLRB reasonably determined that units consisting of meat department employees in two Kmart stores constituted appropriate bargaining units and therefore properly found that Kmart violated sections 8(a)(5) and (1) of the National Labor Relations Act by refusing to bargain with the duly certified collective bargaining representatives of those employees.

AFFIRMED.